In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3836

Svetlana Galina and Viatcheslav Galin,

Petitioners,

v.

Immigration and Naturalization Service,

Respondent.

Petition to Review an Order of the
Board of Immigration Appeals.

Argued April 17, 2000--Decided May 22, 2000


 Before Posner, Chief Judge, and Fairchild and Diane
P. Wood, Circuit Judges.

 Posner, Chief Judge.  Svetlana Galina and her
husband have been ordered deported to Latvia.
Although the Board of Immigration Appeals found
that she had been persecuted in Latvia, from
which the couple fled to the United States in
1994, the Board denied their application for
asylum on the ground that she can have no
reasonable fear of persecution if she is returned
to Latvia because conditions there have changed
for the better since 1994. For this conclusion
the Board relied entirely on statements of which
it took administrative notice that are contained
in the U.S. State Department's 1998 "Country
Report" for Latvia.

 Galina worked as a secretary to an official,
named Baumaniis, of Latvia's "Green Party" (also
known as LNIM). The party's platform advocated
making Latvia a home for all nationalities. About
a third of the population consists of Russians
who (or the parents of whom), in accordance with
a Soviet policy of Russifying conquered
territories, moved to Latvia in the wake of the
Soviet Union's takeover of the country in 1940.
The Russian inhabitants of Latvia are greatly
resented by the native Latvians, and unlike the
latter must apply to become Latvian citizens.
Their applications are being processed slowly,
and as of two or three years ago 30 percent of
the Latvian population were still noncitizens.

 The Green Party opposed, or at least purported
to oppose, this xenophobic policy. One day in

September 1993 Boumaniis accidentally left a folder on Galina's desk. She looked inside and discovered a 20-page list of names and addresses of persons who were to be considered subject to being deported and having their property confiscated. All the names on the list were Russian or Jewish. (Galina is both. Any Jew living in Latvia was likely to have been part of the Russian immigration, since the native Jewish population of Latvia had been wiped out by the Nazis, see generally Kalejs v. INS, 10 F.3d 441, 443 (7th Cir. 1993), who conquered Latvia in 1941 and retained control of it until almost the end of the war.) Galina confronted Baumaniis about the list, which she suspected had been compiled by leaders of the party. He rebuffed her questions and told her it was none of her business and she should forget about its existence. The atmosphere in the office immediately turned hostile to her, she was given no new assignments, and she quit after three weeks. Shortly afterwards she began receiving threatening phone calls. Two men approached her in the lobby of her apartment building, demanding the list. Her daughter was attacked on the way home from school, and a phone call to Galina linked the attack to the list. Her husband was attacked by men who came to their apartment and made taunting remarks about their daughter. In April of the following year Galina was abducted by uniformed men, tied to a tree in a remote area, threatened with a gun, and told to leave Latvia. The threatening phone calls continued. All this occurred against a background of other outrages committed against the Russian residents of Latvia. The couple didn't think it would do them any good to complain to the police about the abduction and the other violence visited on the family, since only Latvian citizens are permitted to be policemen and since she suspected that her abductors were the agents of powerful people. However, Galina's husband did report the threatening phone calls to the police, who located one of the callers, and the calls stopped.

 Two months after Galina's abduction, she left for the United States. Her husband, who was again receiving threatening phone calls, soon followed. (The daughter remains in Latvia.) Galina is stateless, since as a Russian not living in Latvia when the Soviet Union annexed it in 1940 (she had not yet been born), she is not a Latvian citizen. Her husband is stateless too. He does not claim to have been persecuted, like his wife; but as her husband he is entitled to asylum if she is. 8 U.S.C. sec.sec. 208.20(a), 1158(b)(3); Nenadovic v. INS, 108 F.3d 124, 125 n. 1 (7th Cir. 1997); Duarte de Guinac v. INS, 179 F.3d 1156, 1158 n. 3 (9th Cir. 1999).

Under the applicable regulations, once an asylum seeker is found to have been persecuted in the country to which he or she has been ordered deported, the burden shifts to the immigration authorities to prove that she has no well-founded fear of further persecution. 8 C.F.R. sec.sec. 208.13(b)(1)(i), (ii); Asani v. INS, 154 F.3d 719, 722 (7th Cir. 1998); Bradvica v. INS, 128 F.3d 1009, 1012 (7th Cir. 1997); Chanchavac v. INS, 207 F.3d 584, 589, 592 (9th Cir. 2000). The Board found that burden discharged here by information, of which it took administrative notice, found in the State Department's 1998 country report on Latvia. The Board said that the report revealed "an improved human rights situation in Latvia," noting that "a free and fair election occurred" in 1996 and that the government of Latvia "generally respected the human rights of its citizens and the large resident noncitizen community," i.e., the Russians. "Although certain human rights abuses occur, in most instances the government" (in the words of the country report as quoted by the Board) "'took disciplinary action, against those responsible' for the abuses." The Board also opined that the action taken by the police in response to Mr. Galin's complaint about the threatening calls cast doubt on the couple's claim that the police were unwilling to protect them from violence arising from her having seen the list of persons whom the Green Party apparently wanted to see deported in the teeth of its proclaimed policy of tolerance.

The Board's analysis was woefully inadequate, indicating that it has not taken to heart previous judicial criticisms of its performance in asylum cases. See, e.g., Chitay-Pirir v. INS, 169 F.3d 1079, 1081 (7th Cir. 1999); Stankovic v. INS, 94 F.3d 1117, 1120 (7th Cir. 1996); Hengan v. INS, 79 F.3d 60, 63-64 (7th Cir. 1996); Salameda v. INS, 70 F.3d 447, 449, 451 (7th Cir. 1995); Bastanipour v. INS, 980 F.2d 1129, 1133 (7th Cir. 1992); Colmenar v. INS, No. 98-70422, 2000 WL 376671, at *4 (9th Cir. Apr. 14, 2000); de la Llana-Castellon v. INS, 16 F.3d 1093, 1097-98 (10th Cir. 1994). The elementary principles of administrative law, the rules of logic, and common sense seem to have eluded the Board in this as in other cases. We are being blunt, but Holmes once remarked the paradox that it often takes a blunt instrument to penetrate a thick hide.

The fact that the police had responded to Mr. Galin's call in 1993 or 1994 might be a reason to find that his wife had not been a victim of persecution after all, since a finding of persecution ordinarily requires a determination

that government authorities, if they did not actually perpetrate or incite the persecution, condoned it or at least demonstrated a complete helplessness to protect the victims. E.g., Bucur v. INS, 109 F.3d 399, 403 (7th Cir. 1997); Hengan v. INS, supra, 79 F.3d at 62; Borja v. INS, 175 F.3d 732, 735 n. 1 (9th Cir. 1999) (en banc); Aguilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir. 1999). But the Board found that Galina had been a victim of persecution notwithstanding the police response to her husband's call, and this implies that if she were returned to Latvia and subjected to the same treatment (or worse--since her persecutors wanted her out of Latvia, and so may kill her if they can't keep her out of the country), it would still be persecution, even if the police might take some action against telephone threats.

Next, the Board misapplied the doctrine of administrative (sometimes called "official") notice. Like its more familiar cousin, judicial notice, the doctrine authorizes the finder of fact to waive proof of facts that cannot seriously be contested E.g., Petrovic v. INS, 198 F.3d 1034, 1038 (7th Cir. 2000); Gonzalez v. INS, 77 F.3d 1015, 1024 (7th Cir. 1996); Kaczmarczyk v. INS, 933 F.2d 588, 593-94 (7th Cir. 1991); Rivera-Cruz v. INS, 948 F.2d 962, 966-67 (5th Cir. 1991). Some of the facts recited in the State Department's 1998 country report on Latvia are of this character, such as the fact that Latvia regained its independence from the Soviet Union in 1991. But the facts on which the Board relied are not. In fact they aren't facts at all, but either summaries of Latvian laws (or other official pronouncements) or State Department statements of opinion the precise meaning and factual basis of which are obscure, such as that Latvia had a "free and fair" parliamentary election in 1996 or that human rights are "generally respected." Since the Board is not cabined by the rules of evidence, it is free to treat the information in country reports as evidence, 8 C.F.R. sec. 208.12(a); Dobrota v. INS, 195 F.3d 970, 974 (7th Cir. 1999); Vaduva v. INS, 131 F.3d 689, 691 (7th Cir. 1997), but it is not free to give conclusive weight to statements in those reports that not only are not incontestable, but also are not even facts. Dobrota v. INS, supra, 195 F.3d at 974; Gramatikov v. INS, 128 F.3d 619, 620 (7th Cir. 1997); Borja v. INS, supra, 175 F.3d at 738; Gailius v. INS, 147 F.3d 34, 46 (1st Cir. 1998); Fergiste v. INS, 138 F.3d 14, 19 (1st Cir. 1998); Vallecillo-Castillo v. INS, 121 F.3d 1237, 1239-40 (9th Cir. 1996); de la Llana-Castellon v. INS, supra, 16 F.3d at 1098.

The Board ought by this time to realize,

moreover, that in the case of countries that are friendly to the United States, such as Latvia, the State Department's natural inclination is to look on the bright side. Gramatikov v. INS, supra, 128 F.3d at 620; Gailius v. INS, supra, 147 F.3d at 46. We do not think the 1998 country report for Latvia can fairly be described as a whitewash, since it has rather tart things to say about the country's judiciary, which it calls inefficient and corrupt, and about prison conditions, which it describes as deplorable, and about the prevalence of child prostitution, and about human rights abuses by police and members of the security apparatus (remember it said only that human rights are "generally respected"). The country report is evidence and sometimes the only evidence available, but the Board should treat it with a healthy skepticism, rather than, as is its tendency, as Holy Writ.

The Board's worst error, a rather astounding lapse of logic, remains to be mentioned. The Board relied on the 1998 country report to show that the persecution by the Greens that drove Galina and her husband out of Latvia in 1994 is unlikely to recur. But we cannot find anything in the report that bears on that question. No doubt the general situation with regard to respect for human rights is relevant, but the Board mischaracterized the report in saying that it revealed an "improved human rights situation in Latvia." There is nothing about improvement. It does say such things as that there was a free and fair election in 1996, but it does not say that there was not a free and fair election in 1993 or 1994. It says that human rights are generally respected but not that they are more respected than they were when Galina and her husband were being persecuted. If conditions relevant to that persecution are unchanged since 1994, the Board had no basis for concluding that the couple has no well-founded fear of persecution if they are sent back to Latvia.

The general point is that if the Board is going to rely on a recent country report to establish current conditions in the country, the proper baseline for comparison is not the asylum seeker's testimony, but an earlier country report. Remember that the Board accepted Galina's testimony. So if the 1994 country report was as rosy as the 1998 one, this would show not that Galina has no well-founded fear of further persecution should she be returned to Latvia, but that the earlier report was incomplete.

The 1994 country report is in the record, and at argument the immigration service's lawyer told us that we should assume the Board read it and compared it with the 1998 report and on the basis

of that comparison concluded that the human rights situation in Latvia that would confront Galina on her return had indeed improved. We doubt that it would be a realistic assumption, considering that the immigration service's brief does not mention the 1994 report. Yet we might indulge the assumption, or invoke the doctrine of harmless error, if a reading of the 1994 report made clear that there had been significant changes bearing on the reasonableness of the couple's fear of persecution--changes so great that it would indeed be unreasonable of them to fear being persecuted if they go back. But the report does not make that clear. For example, it states that "free and fair" parliamentary elections were held in 1993. It makes comments similar to those in the 1998 report about the police and security forces sometimes operating extraconstitutionally. There are no material differences, and so the Board's conclusion that the situation has so improved that Galina and her husband can return to Latvia without fear of further persecution has no basis. Neither report mentions the Green Party, and this is another reason to question the adequacy of the country reports to determine the risk of persecution; the reports are brief and general, and may fail to identify specific, perhaps local, dangers to particular, perhaps obscure, individuals.

The shortcomings of these reports, which we have been emphasizing in this opinion, are especially germane when, as in this case, the burden of persuasion is on the immigration authorities rather than the alien. The burden was not carried--the presumption of a well-founded fear of persecution was not rebutted--and so the Board's order must be reversed and the case remanded for further proceedings consistent with this opinion.

Reversed.