

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-24-2001

# Lin v. INS

Precedential or Non-Precedential:

Docket 00-1849

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Lin v. INS" (2001). *2001 Decisions*. Paper 10.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/10

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 24, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1849

LI WU LIN,

　　　　Petitioner

v.

IMMIGRATION & NATURALIZATION SER VICE,

　　　　Respondent

Petition for Review of a Decision
of the Immigration and Naturalization Service
(A 72 492 341)

Argued December 5, 2000

BEFORE: BARRY, COWEN and
WOOD,*Circuit Judges

(Filed January 24, 2001)

_____

* Honorable Harlington Wood, Jr., United States Circuit Judge, U.S.
Court of Appeals for the Seventh Circuit, sitting by designation.

Theodore N. Cox, Esq. (Argued)
401 Broadway, Suite 1802
New York, NY 10013

   Counsel for Petitioner

Linda S. Wendtland, Esq.
Terri J. Scadron, Esq.
John M. McAdams, Jr., Esq.
Robbin K. Blaya, Esq. (Argued)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

   Counsel for Respondent

OPINION OF THE COURT

COWEN, Circuit Judge.

Li Wu Lin, once a student in the People's Republic of China, participated prominently in four pr o-democracy protests in the weeks and days before the massacre at Tiananmen Square. Fearing persecution in the wake of the government's crackdown, Lin fled his country and eventually arrived in the United States wher e he sought both political asylum under S 208(a) of the Immigration and Nationality Act, 8 U.S.C. S 1158(a), and withholding of deportation under S 243(h) of the Act, 8 U.S.C. S 1253(h). The immigration judge and the Board of Immigration Appeals have denied him relief under both pr ovisions, clearing the way for his deportation. Lin now brings this petition for review.

I

In the spring of 1989 Lin was fifteen-years old and a student at a middle school in the Fujian Province. Sympathetic to the student movement then gaining momentum, Lin joined in marches that pr otested the

2

government's corruption, undemocratic rule, and disregard for human rights.

The first demonstration that Lin joined occurr ed on May 18th, 1989, and involved about 1,000 students who gathered in front of a county gover nment building. Because Lin is unusually tall and, as he puts it, "very active," he was placed at the front of the march and given a protest sign to hold and a headband to wear that demanded freedom for China. He explained that a few of his teachers helped organize the demonstration and participated in the march, but others were afraid of getting involved.

On May 25th Lin again joined the head of the assembled crowd, held a sign, and marched to the county government building. This time when they arrived at the building, the police and army blocked the entrance. Lin and the others tried to push through the barricade to occupy the building, but the officers and soldiers pushed the students back, beating them with electric batons. Lin said he shielded himself with his arms as he retreated. A few days later Lin headed another parade on May 30th, and he went to a fourth on June 2nd when he traveled with others to a large demonstration in front of the city gover nment building in Fuzhou, a large city in the province.

Two days after this last demonstration, the pr otest movement in China ended with the Tiananmen Square massacre in Beijing on June 4th, 1989. Accor ding to every major American newspaper, Chinese soldiers accompanied by 25-ton tanks drove the student protesters from Tiananmen Square, fired on them with automatic weapons, and crushed others to death under the tanks. Newspapers reported that at least 700 people were killed. See, e.g., Daniel Southerland, Death in Tiananmen;W itnesses Describe the Devasting Assault, Washington Post, June 5, 1989, at A1.

Although he did not live in Beijing and had not participated in any protests there, Lin was worried about the sharp change in the government's r esponse to the protests. After an uncle informed him that the police were seeking one of his relatives for her participation in protests, he feared that they would soon come after him too, so he

traveled to an aunt's home in another town about twenty minutes away by bus.

Six days after the massacre in Beijing, on June 10th, two police officers and a brigade leader in fact came to Lin's home. Because he was not there, they spoke to his mother (Lin's father is deceased) and gave her a subpoena demanding that Lin appear immediately for interr ogation at the Security Section, Public Security Bureau. In his written personal statement Lin said that "the officers told my mother I was involved in the democracy movement and they demanded to know my location. When she didn't tell, they demanded she find me. . . . They said I would be arrested and punished strictly if I was caught, including imprisonment." App. at 126.

Although political refugees are rar ely able, amid the confusion of flight, to amass physical evidence verifying the validity of their asylum claims, see Senathirajah v. INS, 157 F.3d 210, 216–17 (3d Cir. 1998), in this case Lin's mother managed to mail him the subpoena she received. A copy of the subpoena, with a translation, has been included in the record, and all of the information on it is consistent with Lin's story. The immigration judge did request that the government check the age or authenticity of the document, but the government failed to take any action.

Despite the police's delivery of the subpoena, Lin never reported for interrogation. Instead he moved from his aunt's house to a much more distant location thr ee hours away, where he stayed for roughly two–and–a–half years while his family gathered the money to pay a smuggler to take him out of the country. During his wait, Lin said he worked briefly in a bakery for a few months, but then quit because he was afraid he would attract the government's attention.

Officials returned to Lin's home five more times to look for him. The first time they returned, on June 20th, 1989, Lin said that the officers took his mother to the Changle County Security Bureau, detained her for half a day, and threatened her when she would not reveal her son's location. Lin said they "asked her many times about me and threatened to jail her." App. at 126. The officers returned in early July of 1989, at the end of 1989, on May

4

1, 1990, and in January of 1991. Lin explained,"They always asked for my location, said I had participated in the student movement, and continued to say I would be in serious trouble if caught." App. at 127.

Lin learned that one of his classmates, Lin Bin, whom he knew well, was arrested and sentenced to one year of detention and forced labor. In Mar ch of 1990 three other classmates were arrested, beaten, and sentenced to between one and one-and-a-half years of detention and forced labor. Lin testified that these classmates "all had participated in the same events that I did, and all were sentenced for their student movement activities." App. at 127.

Once the smugglers supplied him with a fake passport from Singapore, Lin left China on January 25th, 1992, and traveled by airplane first to Sen Jen (phonetic spelling) and then Hong Kong where he stayed for about a week. After a brief stopover in Singapore, he moved again to somewhere in former Czechoslovakia, where he lived with another person from China for about eight months. Fr om there he took a train to a country whose identity he never learned and boarded a plane for the United States, arriving on October 31st, 1992.

Lin appeared before an immigration judge for two evidentiary hearings--one on May 18th, 1993, and the second on September 19th, 1993. The judge rendered a brief oral opinion at the second hearing denying Lin the relief he sought. About six-and-a-half years later--a delay the government's lawyer attributed to the agency's backlog --the Board rejected Lin's appeal. Collectively, the total time that this case has been pending now spans seven-and-a-half years. This delay is unconscionable. As other courts have remarked, many problems are cr eated when asylum cases are so protracted. Salameda v. INS, 70 F.3d 447, 449 (7th Cir. 1995).

In its two-page opinion, the Board found Lin's testimony credible and consistent, but the Board nevertheless concluded that Lin did not have a well-founded fear of persecution in China. The Board reasoned, as did the immigration judge, that since Lin admitted in his testimony

that he joined the other demonstrators in attempting to occupy a county government building during the second demonstration, the subpoena merely showed that the Chinese government was interested in enforcing a neutral law of general applicability, namely the law against trespass.

II

We have jurisdiction under S 106(a)(1) of the Immigration and Nationality Act, 8 U.S.C. S 1105a(a)(1), as amended by S 309 of the Illegal Immigration Refor m and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996). Because this case does not tur n on any novel legal interpretation by the Board and instead involves the Board's fact-finding and application of established legal standards, we will reverse the Boar d's decision to deny asylum and withholding of deportation "only if a reasonable fact-finder would have to conclude that the r equisite fear of persecution existed." Chang v. INS, 119 F .3d 1055, 1060 (3d Cir. 1997) (citing INS v. Elias-Zacarias, 502 U.S. 478, 480, 112 S.Ct. 812 (1992)).

Lin has sought two different types of r elief--political asylum and withholding of deportation. To qualify for political asylum, the first type of relief, an alien must be a "refugee" within the meaning of 8 U.S.C.S 1158(a). Under that provision a refugee includes those who are unable or unwilling to return to their country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion." Chang, 119 F.3d at 1059 (quoting 8 U.S.C. S 1101(42)(A)). In this case Lin seeks to establish that he has a well-founded fear of persecution because of his political opinions. Br eaking this standard into parts, we can say that Lin must show that (1) the government pursued him because of his political opinions, (2) the action that the government would take against him is sufficiently serious to constitute persecution, and (3) he has a "well-founded fear" that the persecution will in fact occur. See, e.g., Chang, 119 F.3d at 1067 n.9.

For the government's action to constitute persecution, it must amount to more than "generally harsh conditions

6

shared by many other persons," but "does include threats to life, confinement, torture, and economic r estrictions so severe that they constitute a real thr eat to life or freedom." Chang, 119 F.3d at 1066 (citations omitted). The requirement that his fear be "well-founded" includes both a subjective and objective component. No one has ever questioned that Lin holds a genuine subjective fear of persecution, so our focus is on the objective standard--i.e., was his subjective fear of persecution "supported by objective evidence that persecution is a reasonable possibility." Chang, 119 F.3d at 1066 (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 430, 440, 107 S.Ct. 1207, 1212, 1217-18 (1987)). This standard "does not r equire a showing that persecution is more likely than not. Fear can be well-founded even `when there is less than 50% chance of the occurrence taking place.' " Chang, 119 F.3d at 1066 (quoting Cardoza-Fonseca, 480 U.S. at 431, 107 S.Ct. at 1213).

If an alien satisfies these standards for political asylum, then the Attorney General has discretion to decide whether to grant asylum or not. Cardoza-Fonseca , 480 U.S. at 428 n.5, 107 S.Ct. at 1211 n. 5. By contrast, if an alien qualifies for withholding of deportation, the second type of relief at issue in this appeal, then the Attor ney General is prohibited from deporting the alien to the country where the persecution will occur. 480 U.S. at 429 n.6, 107 S.Ct. at 1212 n.6.

To qualify for mandatory relief under withholding of deportation, Lin must show a clear probability that upon his return to China "his life or fr eedom would be threatened" because of his political opinions. Chang, 119 F.3d at 1066. Put differently, the standard is that he must show that it is more likely than not that he will face persecution if he is deported. Cardoza-Fonseca, 480 U.S. at 430, 107 S.Ct. at 1212.

In Chang we held that an alien can be entitled to both asylum and withholding of deportation based on a fear of prosecution under a law of general applicability. "[T]he memory of Hitler's atrocities and of the legal system he corrupted to serve his purposes . . . are still too fresh for us to suppose that physical persecution may not bear the nihil

obstat of a `recognized judicial system.' " Chang, 119 F.3d at 1060-61 (quoting Sovich v. Esperdy, 319 F.2d 21, 28 (2d Cir. 1963)). We concluded that if the prosecution is motivated by one of the enumerated factors, such as political opinion, and if the punishment under the law is sufficiently serious to constitute persecution, then the prosecution under the law of general applicability can justify asylum or withholding of deportation. Chang, 119 F.3d at 1061.

III

We conclude that Lin has satisfied both the standards for political asylum and those for withholding of deportation. The Board reasoned in our case that while Lin is credible-- a conclusion in keeping with our decisions in Senathirajah and Balasubramanrim v. INS, 143 F.3d 157 (3d Cir. 1998)-- he does not face persecution. Instead, the Boar d speculated, his testimony only established that the Chinese police sought him for trespass. But the Boar d's view of events is wholly unsupported by the recor d. Nowhere is there any evidence that the Chinese police sought Lin because of his trespass as opposed to his political expression. Indeed, for all the evidence r evealed, the government was not even aware that Lin committed trespass as part of his participation in mar ches. Lin specifically asserted that when the police first came to his house, they said that they sought him because he was "involved in the democracy movement." The police said nothing about trespass. Lin also specifically stated that his classmates were beaten, incarcerated, and subjected to forced labor "for their student movement activities."

More fundamentally, Lin's subpoena was issued six days after the Chinese government used tanks and machine guns to kill at least 700 hundred and possibly more nonviolent protesters. It is difficult to believe that in the wake of political repression on that scale that the government was acting as a disinterested enforcer of neutral laws when it demanded that Lin appear for interrogation. We do not understand why the government would send two police officers and a brigade leader if it did not believe more was at stake than a fifteen-year old's

8

trespass. Nor does it make sense that if simple trespass was at issue, the police would returnfive more times over the course of the next year and a half. That is a long time to pursue a middle-school student's trespass. Nor would it make sense that they would take Lin's mother to the security bureau and interrogate her for half a day about his whereabouts. Nor is it very plausible that the government would subject Lin's classmates to the punishment they received if trespassing was foremost on the government's mind.

The idea that the subpoena was not aimed at Lin's political expression also flies in the face of what journalists reported shortly after the massacre in T iananmen Square. On June 9th, 1989--the day before the police brought the subpoena to Lin's mother--the Wall Str eet Journal reported that the Chinese government "launch[ed] a campaign of arrests against student and other demonstrators." The article said that Premier Li Peng appear ed on television for the first time since the massacre and was"shown congratulating troops on behalf of the gover nment and the Communist Party." The article continued, "Government television announcements demanded that student demonstration leaders and free labor-union organizers turn themselves in or face arrest." James P . Sterba, Campaign is Begun to Arrest Protesters as Signs Gr ow that Hardliners Prevail, Wall Street Jour nal, June 9, 1989. See also Nicholas D. Kristof, China's Premier Reappears; Army Seems to Tighten Grip, New York T imes, June 9, 1989; Nicholas D. Kristof, Crackdown in China; A Student Leader Turns Himself In, June 17, 1989 ("The[Chinese] Government today reported a new series of arrests around the nation of those involved in the democracy movement."). Even a passing familiarity with China's history in the twentieth century would remind the Boar d that the Chinese government has frequently used for ce and coercion to suppress political dissent. The Cultural Revolution occurred as recently as 1966 to 1976--within Lin's own life. Severe political repression is not a remote part of China's history.

Indeed, Assistant Secretary Harold Koh's r ecent testimony in March of 2000 before a House subcommittee indicated, "In the weeks leading up to both June 4th, the

9

10th anniversary of the Tiananmen massacr e, and October 1st, the 50th anniversary of the founding of the People's Republic, the Government moved against political dissidents across the country, detaining and formally arresting scores of activists nationwide and thwarting any attempts to use the anniversaries as opportunities for protest." Testimony before the Subcommittee on International Operations and Human Rights, U.S. House of Representatives, Washington D.C., Mar ch 8, 2000, http://www.state.gov/www/policy_remarks/2000. In the brief Lin submitted in 1993 to the Board, he points out that the State Department's 1992 Country Report stated that 20–30% of the protesters detained for participating in the pro-democracy protests were still imprisoned at that time, and the number of people incarcerated could be in the thousands. App. at 7. Other reports put the numbers even higher. Id.

When the government's lawyer skeptically questioned Lin about why he remembered the exact day he left China-- January 25th, 1989--Lin testified:

> I escaped out of my country. I was so scared of the arrest by the Chinese Public Security Bur eau officers, so I could still remember it.
>
> Q. Okay.
>
> A. I was so scared.
>
> Q. Thank you.

App. at 98.

On appeal the government defends the Boar d's decision by invoking a one-page letter that the State Department submitted to the immigration judge. But the thrust of that letter was to reject Lin's credibility--something the Board expressly did not do. Because the Board never cited the State Department's letter in its opinion and could not have relied on it with much logical consistency, we question to what extent the Board's decision can be upheld based on what that letter said. Perhaps the gover nment's theory is that the Board implicitly rejected Lin's credibility to the extent that it conflicted with what was said in the letter. But the Board of course never identified any part of Lin's

10

testimony that it rejected as not credible, and so we have no way to evaluate the validity of its reasons for purportedly rejecting part of his story. Despite these defects in relying on the State Department's letter , however, we will address the contents of that letter because wefind its reasoning as unconvincing as the Board's.

One reason that the State Department's letter r ejected Lin's account as not credible was that he stayed in China "three years" after the subpoena was issued, yet he did "not explain clearly how he managed, assuming the police were after him, to avoid arrest by staying at the home of a relative who could have been found easily by local security authorities." App. at 130.

Initially, we observe that Lin stayed in China for two-and-a-half years, not three as the letter said, and there are only the most fleeting references in the r ecord about where or with whom he stayed during those years. We also want to emphasize that no one ever asked him how he avoided the authorities. And Lin did volunteer that he tried to escape detection by moving three hours away, and added that he quit working in a bakery after a few months because he was afraid he would attract the government's attention. But the most fundamental point here, of course, is that the authorities could have easily decided that pursuing Lin, a fifteen-year old, was not worth the resour ces it would take to discover him three hours distant and in hiding. China is a big country.

While the State Department's letter acknowledged that the agency did "not have independent knowledge about this applicant," it concluded that Lin's "description of the vigorous police efforts against him and his schoolmates is inconsistent with the situation as we understand it." App. 130. Specifically, the letter said that the "demonstrations [i]n Fuzhou were far less dramatic than those in Beijing, and the crackdown in their aftermath was similarly mild." Id. The only evidence capable of evaluation that the letter cited in support of these claims is an article written by two American college professors who had brought a class of their students to China some time before the T iananmen Square demonstrations.

11

Before we discuss this article, we think it is important to emphasize that the Board's decisions cannot be sustained simply by invoking the State Department's authority. We are expected to conduct review of the Boar d's decisions, and that procedural safeguard would be destroyed if the Board could justify its decisions simply by invoking assertions by the State Department that themselves provide no means for evaluating their validity. See Galina v. INS, 213 F.3d 955, 958-59 (7th Cir. 2000). The Board cannot hide behind the State Department's letterhead. We turn therefore to the college professor's article and its value in assessing the legitimacy of Lin's claims.

The first problem with the article is that it is difficult to discern how close the authors were to the specific county where Lin lived and whether they had any first-hand knowledge about the demonstrations there or the police response to it. Their article does observe that Fujian Province, the region they discuss, is the size of Nicaragua or the former Czechoslovakia and had in 1989 a population of 26 million people. Obviously they were not speaking from personal experience about all the demonstrations in a region that size. And there are r easons to doubt how well their observations generalize. While they described as "benign" the police response to the pr otests that they saw, and add that a month before the massacr e, the Provincial Party Committee had "praised [the students'] patriotism," app. at 134-35, the authors do not mention any of the protests Lin described, protests that the Board accepted as having occurred and that indeed formed the basis of its decision.

The Board's own reasoning relied on the fact that the police sought Lin because he tried to press past police and soldiers to occupy a government building. And Lin explained that during that clash, the authorities beat protesters with electric batons, confrontations that the professors showed no awareness of while describing the police response as benign. The authors also maintained that the demonstrations in the region "r eached their peak" on May 18th, which was the date Lin joined in his first march. These omissions and errors r einforce the impression that the professors' on-the-gr ound observations

12

may not have been as accurate as those by someone like Lin who lived all his life in the area.

But the most important defect in the government's reliance on this article is that the benign police responses reported by the authors all occurred befor e the massacre in Tiananmen Square. Events before the massacre are not the appropriate standard for judging the political fallout afterwards. It is well understood that the Chinese government's decision to use force against the protesters in Beijing was the product of a power struggle within the government and that those favoring less fr eedom emerged in control. This shift in leadership inevitably prompted a more repressive approach by the government. Even the authors of the article acknowledge that befor e the massacre, "Fujian officials were r eluctant to take tough measures against demonstrators, perhaps because they could not predict the outcome of the crisis." Id. at 134. The authors also indicated that the situation was much more serious after the massacre. Even in the location where the authors were, "there was a realistic acceptance that further demonstrations would be dangerous. We only witnessed one more, on 6 June." Id. at 136. The article adds that the university in Fuzhou closed two weeks early, and while a short time later national and provincial education commissions "demanded that schools make students return to class," many parents were afraid to let their children return. App. at 137. The authors observed, "By 18 June, Fuzhou was utterly quiet." Id.

At one point the article does remark, "A few students were questioned by the police, but we hear d of no arrests." App. at 142. But there is no reason to think that two American college professors--who were busily shepherding a class of students--were especially well informed about whom the police sought, particularly in a region with 26 million inhabitants in an area the size of for mer Czechoslovakia. The Chinese government did not make these college professors privy to their enfor cement plans. Lin testified credibly that the police served him with a subpoena six days after the massacre in Beijing, and he even supplied the subpoena to the immigration judge. He also testified that he learned that four of his classmates

13

were arrested and punished for their participation in protests. Significantly, Lin said that at least three of those arrests occurred in March of 1990, a date well after the article was written and almost a year after the massacre.

The article also acknowledged that the Chinese government was keenly aware of public r elations and did try to manipulate foreigners who were visiting. The authors commented that when the evening news showed footage of two of the American students walking in a mar ch with Chinese students, the professors received a call rebuking them even before the broadcast was over , and the police refused to extend any student's visa beyond the end of the term. And once the massacre occurr ed, with its sea-change in the government's response, the pr ofessors explained that they declined to attend a banquet because other for eigners who had done so in other cities were filmed and televised as supporters of Beijing. It is also significant that we are not presented with any evidence vouching for the quality of the scholarship in this article.

We think Judge Posner's remarks in Galina about the Board's reliance on one of the State Department's country reports apply equally here: "The country report is evidence and sometimes the only evidence available, but the Board should treat it with a healthy skepticism, rather than, as is its tendency, as Holy Writ." Galina , 213 F.3d at 959. Finally, the article and Lin's account are actually consistent in many respects. Both report that fr equent demonstrations occurred, and the article also confir ms Lin's claim that the police had access to videotapes of the demonstrations. They also agree that the government's r esponse was not as severe as in Beijing. But much as Galina  cautioned that a country report saying that human rights wer e "generally respected" did not categorically rule out an alien's claims of persecution, id., so too the fact that the government did not kill hundreds of people where Lin lived does not mean that the government took no repressive action there. The Board's performance in this case was less than it should have been, a problem that, as Judge Posner has remarked, appears to occur too often. See Galina, 213 F.3d at 958 (collecting cases). This court has itself rejected the Board's credibility judgments in two published opinions, Balasubramanrim and Senathirajah.

14

At oral argument the government maintained that a year and a half of incarceration and forced labor for a fifteen-year old who voiced opposition to the government is not sufficiently severe punishment to qualify as persecution. We emphatically disagree. That is a very long sentence for simply voicing opposition to the government. If in Chang a one-year or possibly longer sentence was sever e enough to qualify as persecution for an adult who violated China's exit laws based on his political beliefs, see 119 F.3d at 1066-67, we think it follows that the year-and-a-half and possibly longer sentence that Lin faces also constitutes persecution. We also think it is worth pointing out that Lin has in addition broken China's law by fleeing the country and faces the same prosecution for that offense as the petitioner in Chang. And unlike Chang, ther e can be no dispute that Lin fled because of his political beliefs.

IV

We hold that Lin has satisfied the standar ds for both political asylum and withholding of deportation. For the foregoing reasons, the Board's or der of March 10, 2000, will be reversed and remanded for further pr oceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

15