

Villanova University School of Law Digital Repository

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-29-2004

# Archvadze v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1345

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Archvadze v. Atty Gen USA" (2004). *2004 Decisions.* Paper 907.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/907

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 03-1345

GOCHA VALODIEVICH ARCHVADZE,

Petitioner

v.

JOHN ASHCROFT,
ATTORNEY GENERAL OF THE UNITED STATES

On Petition for Review of an Order of Removal from
the Board of Immigration Appeals
U.S. Department of Justice
Executive Office for Immigration Review
(BIA No. A78-227-119)

Argued: February 9, 2004

Before: SCIRICA, Chief Judge, ROTH and McKEE, Circuit Judges.

(Filed March 29, 2004)

Jon Landau
Erica S. Gonzalez (argued)
Baumann, DeSeve & Landau
437 Chestnut Street
The Lafayette Building
Philadelphia, PA 19106
Attorneys for Petitioner

David V. Bernal
Douglas E. Ginsburg
Lyle D. Jentzer
Jennifer Paisner (argued)
United States Department of Justice
Office of Immigration Litigation

P.O. Box 878
Ben Franklin Station
Washington, DC  20044
<u>Attorneys for Respondent</u>

––––
_____

OPINION

McKEE, <u>Circuit Judge</u>.

Gocha Valodievich Archvadze petitions for review of the Board of Immigration Appeals' ("BIA") order of removal.  Because we find that the BIA's decision is not supported by substantial evidence, the decision will be reversed and we will remand to the BIA for further review based on this Opinion.

**I**

Archvadze is a 36-year old native and citizen of the Republic of Georgia.  A.R. 248.  He is married and has one daughter, both of whom remain in Georgia.  A.R. 60, 250.  In December 1997, Archvadze began working as the Assistant Chairman of the Department of Social Questions for the City of Rustavi.  A.R. 59, 233.  Shortly thereafter, he was pressured by other municipal workers to join the Union of Citizens Party ("Citizen's Union"), the party of then-President Eduard Shevardnadze.[1]  A.R. 233.  However, despite the pressure, he refused to join.  *Id.*  Instead, in May 1999, Archvadze

---

[1] In November 2003, Shevardnadze resigned from power amidst massive protests against his government.

joined a newly-organized opposition party now known as the Liberal Party of National and Industrial Rise ("Liberal Party"), which had about 3000 members in Rustavi.[2] *Id.* As a party member, he participated in election campaigns and was a member of the committee responsible for recruiting new members. *Id.*

On August 20, 1999, four men severely beat Archvadze and threatened to kill him if he did not join the Citizen's Union. A.R. 65. When he reported the attack, the police warned him not to file formal charges because one of the individuals who beat him was a "big shot." A.R. 66. After the beating, Archvadze began receiving phone calls from individuals threatening to kill him if he did not cease his activities on behalf of the Liberal Party. A.R. 67. On September 10, 1999, he was attacked by three men, one of whom he recognized from the previous beating. A.R. 68. Again, the men told him that if he did not stop his political activities, he would be killed. A.R. 69. Following the second attack, Archvadze and his family moved to the city of Kvareli to live with his parents. *Id.* Thereafter, he decided to flee the country.

Archvadze entered the United States on October 8, 1999, pursuant to a visitor visa, which expired on March 7, 2000. A.R. 248, 273-74. On June 26, 2000, he filed an asylum application (A.R. 248-58), which was denied on June 4, 2001. A.R. 35-41. The Hon. Craig Debernardis, the Immigration Judge, found that "[t]he record of evidence

---

[2] The party was formerly known as the Party of National Economic and Industrial Progress. A.R. 233

3

[did] not establish a plausible context for the respondent's claim that those [who] allegedly assaulted him in 1999 were motivated by political considerations." A.R. 40. On January 6, 2003, the BIA issued a *per curium* order affirming the IJ's decision without opinion pursuant 8 C.F.R. § 1003.1(e)(4), thereby making the IJ's decision the final agency determination. A.R. 2. This appeal followed.

## II

The Attorney General has discretion to grant asylum to an alien who qualifies as a "refugee." 8 U.S.C. § 1158(b). The Immigration and Nationalization Act defines "refugee" as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). In order to meet this standard, an alien must possess "a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." *Chang v. INS*, 119 F.3d 1055,1166 (3d Cir. 1997). In other words, "[t]he applicant's statements . . . must be viewed in the context of the relevant background situation. " *Matter of Dass*, 20 I.& N. Dec. 120, 125 (1989). However, an alien does not have to show a clear probability of persecution in order to be granted

4

asylum. As the Supreme Court noted in *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987), "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." If an alien establishes that he or she suffered past persecution, a rebuttable presumption arises that he or she has a well-founded fear of persecution in the future. 8 C.F.R. § 208.13(b)(1).

In order to withstand appellate review, the agency decision must be supported by "substantial evidence." *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . ." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939) (citation and internal quotation marks omitted). In other words, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ." 8 U.S.C. § 1252(b)(4)(B).

As stated above, Archvadze claims that he was beaten and harassed by the Citizen's Union because of his activities on behalf of the Liberal Party. While the IJ did not directly question Archvadze's credibility, he did find that "[t]here [was] no objective evidence in [the] record to show that party activists supporting the opposition Liberal Party had been subjected to attacks by thugs employed by the Citizen's Union Party." A.R. 39. In coming to this conclusion, the IJ relied solely on a letter from William E.

5

Dilday, Director of the State Department Office of Country Reports and Asylum Affairs ("Dilday Letter"), which states, in relevant part: "According to the Embassy there have been no reports of the Citizen's Union attacking members of other parties, nor of any problems between the Liberal Party and the Citizen's Union, any other party, or with the authorities." A.R. 142. Moreover, the IJ rejected the expert testimony of Professor Stephen Jones as well as documentary evidence submitted by Archvadze in support of his claim. We will address each piece of evidence in turn.

## A. Dilday Letter

We have held on several occasions that letters such as the Dilday Letter, standing alone, cannot sustain an adverse decision by the BIA. *Li Wu Lin v. INS*, 238 F.3d 239, 246 (3d Cir. 2001) ("[T]he Board's decisions cannot be sustained simply by invoking the State Department's authority."); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 407 (3d Cir. 2003) ("[W]e are concerned that the INS is attempting to use the prestige of the State Department letterhead to make its case and give credibility to the letter's contents."). As we noted in *Li Wu Lin*, the procedural safeguards ensured by appellate review "would be destroyed if the [BIA] could justify its decisions simply by invoking assertions by the State Department that themselves provide no means for evaluating their validity." 238 F.3d at 426. This case illustrates the weakness of such letters. The Embassy report does not exclude the possibility that members of the Liberal Party suffered physical attacks at the hands of the Citizen's Union. More importantly, there is no information as to the

6

amount of effort, if any, the Embassy put into uncovering reports of such attacks nor the source(s) relied upon in reaching its conclusion. Therefore, we find the Dilday Letter woefully inadequate to support the IJ's decision.

**B.    Expert Testimony**

During Archvadze's second evidentiary hearing, Professor Jones testified as an expert on Georgian culture and politics.[3] Jones stated that the attacks and threats described by Archvadze were "quite common in Georgia." A.R. 99. When asked for specific examples of "similar situations," Professor Jones discussed an incident where a journalist was beaten up because he authored several articles criticizing the Citizen's Union. A.R. 100-01. The IJ and Professor Jones then engaged in the following colloquy with respect to the Dilday Letter:

> Q.    Professor, I'm referring to this State Department letter it says, and I quote: 'according to the Embassy there have been no reports of the Citizen's Union attacking members of other parties nor of any problems between the Liberal Party and the Citizen's Union[,] any other party[,] or with the authorities.' What's your response to that, sir?
>
> A.    Well, it's quite true, probably there haven't been any reports but you know the State Department probably doesn't know what's going on in most [of the] provincial cities in Georgia . . . . [T]hese things are quite common so very often these sorts of instances will not get published in the press either.
>
> Q.    Well, what I don't understand sir, if they're so common and everybody knows about them why aren't there things that can be accessed by say, for example, newspaper articles, etcetera.

---

[3] Jones is a professor of Russian and Eurasian Art at Mount Holyoke College. A.R. 97.

A.      There are very few newspapers . . . in the provinces primarily because of financial reasons[,] and so . . . it's very hard in some cases to know what's going on in the provinces unless you actually go visit . . . . If there is something . . . that goes on, very often it can be successfully suppressed . . . .

A.R. 107-08.[4]

Ultimately, the IJ was unconvinced by the testimony of Professor Jones.

Specifically, the IJ stated:

> [Professor Jones] was unable to relate any specific instances where party activist such as the [Archvadze] were subjected to attacks by thugs controlled by the Citizen's Party. Instead, [he] stated that most of these reports regarding the activities of the Citizen's Union were 'not reported.' When one considers [Professor Jones'] inability to provide any specific instances, with his admitted inability to provide reports from journalists, etcetera, the expert witness was not persuasive on the topic of attacks by Citizen's Union Party against members of the Liberal Party.

A.R. 38-39. However, there are several problems with the IJ's rejection of Professor Jones' testimony. To begin, Jones' testimony is actually consistent with the Dilday Letter. That is, it explains why the United States Embassy has not received any reports of the Citizen's Union attacking members of opposing political parties. Moreover, the IJ's assertion that Professor Jones "was unable to relate any specific instances where party activists . . . were subjected to attacks" ignores the fact that he never directly asked for such information. A.R. 38. The IJ simply asked Professor Jones if he was aware of any

---

[4] Professor Jones' testimony here is consistent with his description of the attack on the journalist who wrote articles that were critical of the Citizen's Union.

situations that where "similar" to one described by Archvadze. A.R. 100. After the professor described the incident involving the journalist, the IJ immediately moved on to another line of questioning. A.R. 100-01. Thus, the only conclusion that can be reasonably drawn from this portion of Professor Jones' testimony is that there was an attack on a journalist. It cannot, however, be presumed that the professor did not have any further examples of politically-motivated attacks that may have been *more* similar to Archvadze's situation.[5] Therefore, we reject the IJ's rationale for dismissing the testimony of Professor Jones.

### C.    Documentary Evidence

At the conclusion of the second evidentiary hearing, the IJ indicated that he was still unpersuaded that the attacks on Archvadze occurred because of his membership in the Liberal Party. Thus, he gave Archvadze an opportunity to find and submit documentation "that provides a plausible context that these kinds of beatings are going on . . . ." A.R. 112. Archvadze subsequently submitted several additional country reports in an attempt to bolster his claim. The first report states that during the October 1999

---

[5] To be clear, we are not stating that the IJ should have assumed, nor are we assuming, the inverse to be true, *i.e.*, that Professor Jones would have been able to provide an example(s) of a party activist, such as Archvadze, being attacked by the Citizen's Union. There is no question that such an inference would be equally improper based on the record. Our point is simply that it is unreasonable for the IJ to ask a question that could be answered in a variety of ways, accept a particular answer without further question, and then assume in hindsight that the witness would not have been able to provide any additional answers.

election "[v]oters were strongly encouraged–in some cases to the point of blackmail–to vote for [the] Citizen's Union . . . ." A.R. 126. Another report provides that "during the election campaign" the Citizen's Union engaged in "scurrilous attacks . . . on the opposition" and that there were "numerous reports of beatings, arrest, intimidation and other physical interference with [an opposition party] campaign by functionaries of Citiazens' Union . . . ." A.R. 129.[6]

However, the IJ remained unpersuaded. Specifically, he noted that the reports "relate to incidences that occurred in October, 1999" while the "alleged attacks upon [Archvadze] supposedly occurred in August and September, 1999." A.R. 39. The IJ's reasoning in this instance is unjustifiably demanding and does not provide a sufficient basis for rejecting the documentary evidence submitted by Archvadze. That is to say, it is difficult to imagine a closer proximity between objective country conditions and a petitioner's subjective testimony. First, both of the alleged attacks occurred less than two months prior to the October 1999 election. Moreover, the documentary evidence suggests that various politically-motivated attacks by the Citizen's Union occurred over the entire course of the election campaign, not merely on election day. For example, one report states that: (1) students were threatened with expulsion if their parents did not vote for

---

[6] Archvadze also submitted two additional documents, indicating that Jumber Patiashvili, a presidential candidate from an opposition party, was attacked in March 2000. A.R. 132-139.

Citizen's Union candidates; (2) electricity was cut off in areas where there was strong support for opposition parties; and (3) soldiers were ordered to vote for the Citizen's Union "on pain of serious punishment." A.R. 126. It is unreasonable to assume that all of these events occurred only during the election. In fact, the only tenable conclusion that can be drawn from these facts is that the Citizen's Union threatened and attacked opposition party members prior to, and during, the October 1999 election. This, of course, completely contradicts the assumption the IJ drew from the Dilday Letter (*i.e.*, that the Citizen's Union has not attacked members of opposing political parties). For this reason, we find that there is not a sufficient basis for IJ's rejection of the documentary evidence submitted by Archvadze. In fact, we think it necessary to express our concern that the IJ seemed to raise the bar every time Archvadze appeared to clear a hurdle that the IJ himself had set.

## III

Based on the foregoing analysis, we will reverse the decision of the BIA, and remand this case to the agency for further consideration. That consideration will, of course, include any evidence of changed country conditions that may be relevant to Archvadze's petition given the changed political climate that would await him if his petition is ultimately denied.

11