

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-10-2007

# Suherwanto v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1621

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Suherwanto v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1121.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1121

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1621

_____

SUHERWANTO,
Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES; SECRETARY OF
DEPARTMENT OF HOMELAND SECURITY,
Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A95-377-266
(U.S. Immigration Judge: Honorable Donald Vincent Ferlise)

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 26, 2007

Before: SCIRICA, *Chief Judge,* FUENTES, and ALARCÓN,[*] *Circuit Judges.*

(Filed: May 10, 2007)

_____

OPINION OF THE COURT

_____

[*]The Honorable Arthur L. Alarcón, Senior Judge of the United States Court of
Appeals for the Ninth Circuit, sitting by designation.

_____

ALARCÓN, *Circuit Judge*.

Mr. Suherwanto has petitioned for review of the final order of removal by the Board of Immigration Appeals ("BIA"). He contends that the BIA departed from its own precedent in so doing. We will affirm because we conclude that Mr. Suherwanto has failed to demonstrate that he was subjected to past persecution because he is a homosexual.

We have jurisdiction to review this timely petition pursuant to 8 U.S.C. §1252 (a)(1).

I

Mr. Suherwanto is a native and citizen of Indonesia. He entered the United States on or about January 29, 2001, with a non-immigrant visa authorizing him to remain no longer than February 10, 2001. He filed an application for asylum on January 23, 2002.

On March 11, 2002, the Immigration and Naturalization Service issued a notice to appear alleging that Mr. Suherwanto was removable under 8 U.S.C. § 1227 (a)(1)(B).

At a hearing conducted on April 25, 2002, before an Immigration Judge ("IJ"), Mr. Suherwanto admitted the facts alleged in the notice to appear, and conceded that he was removable. He asserted, however, that he should not be removed because he was entitled to asylum, withholding removal, and protection under Convention Against Torture

2

("CAT") because he is subject to persecution and torture in Indonesia because he is a homosexual.

At the removal proceedings conducted on April 25, 2002, Mr. Suherwanto testified that he was subjected to persecution in Indonesia because of his homosexuality on five different occasions. When he was nine years old, he was forced into an act of anal sex by an adult male who was teaching him the Muslim religion. He did not report the incident to the police or school authorities because he was threatened by the sexual predator.

In a statement attached to his application for asylum, Mr. Suherwanto alleged that "when [he] was sixteen years old, [he] realized that [he] was not attracted to women, but to men." When he was sixteen, he was introduced by his father to a customer who was a male Chinese grocer. On November 10, 1992, someone observed him kissing the Chinese man on the front porch of his family's residence. The witness reported the incident to the chief of the village. The village chief informed Mr. Suherwanto's parents that they would have to leave the village because their son's behavior was contrary to Islamic principles. Instead of leaving the village, Mr. Suherwanto's parents committed suicide by drinking insecticide. Mr Suherwanto discovered their bodies the next day. He testified that he believed that they killed themselves because they were ashamed of his homosexuality.

A few days after his parents committed suicide, Mr. Suherwanto left the village

3

and went to live with the Chinese grocer in Lumajang. Mr. Suherwanto testified that from 1992 until 1998 he lived with his male partner without being harassed by anyone because of his homosexuality.

Mr. Suherwanto testified that a riot occurred in Indonesia in May 1998, involving ethnic Indonesians and Chinese residents. On October 28, 1998, more than one hundred ethnic Indonesians came to the store owned by Mr. Suherwanto's Chinese male partner. Mr. Suherwanto was his employee. The rioters threatened to set fire to the store. They stole everything in the grocery store. This criminal conduct occurred during a riot that resulted in the looting of several other stores in the area. Mr. Suherwanto testified that the looters were angry at him because he worked for a Chinese grocer. Mr. Suherwanto was unable to identify any of the rioters.

Mr. Suherwanto testified that the police were called but they did not do anything. The police requested money to conduct an investigation and provide security for Mr. Suherwanto and his male partner. The police were given the equivalent of two hundred dollars in United States currency to protect the store from rioters.

After this incident, the store was closed for six months. It reopened on April 21, 1999. A few days later a group of ethnic Indonesians came to the store and threatened Mr. Suherwanto and his Chinese employer that if they did not lower prices, the store would be destroyed and they would be tortured. Although the prices were lowered, the

4

intruders proceeded to steal merchandise and ransack the store. One of the thieves burned Mr. Suherwanto's chest with a cigarette butt. His stomach was also burned with a hot iron. Mr. Suherwanto testified that the police were called. Mr. Suherwanto stated that the police refused to help, however, because they were also ethnic Indonesians. The store was closed on April 28, 1999.

The final discriminatory event related by Mr. Suherwanto occurred in the year 2000. Mr. Suherwanto entered law school in January of that year. After school officials discovered he was a homosexual, the dean told him he would destroy the reputation of the law school if he remained a student. Mr. Suherwanto quit law school on June 13, 2000.

Mr. Suherwanto's male partner died on January 3, 2001, of a heart attack. Mr. Suherwanto testified that he decided to leave Indonesia on January 29, 2001, because the Muslim religion does not tolerate homosexuality. He admitted on cross-examination that he was aware that homosexual conduct was not barred under Indonesian law.

The IJ received evidence that an amendment to the Indonesian Constitution enacted in the year 2000 provides protection for gays and lesbians. The IJ also relied on an article in *Gay Times* that reflects that, while Indonesia is a Muslim country, it is tolerant of homosexuality.

The IJ concluded that the five incidents reported by Mr. Suherwanto did not constitute persecution. Instead, the IJ determined that the rioters's conduct and the sexual

abuse of Mr. Suherwanto when he was nine years old were the result of criminal activity. The IJ also found that while the village chief's request that Mr. Suherwanto and his family leave their home, and the law school dean's demand that he drop out of law school were homophobic, they did not constitute persecution under existing law. In denying Mr. Suherwanto's application for relief from deportation, the IJ also concluded that "there is absolutely no evidence that the government of Indonesia persecutes homosexuals or is unwilling or unable to protect them." The IJ found that Mr. Suherwanto had not "established a well-founded fear of persecution if he is returned to his native Indonesia much less as [sic] he proved that there is a clear probability of persecution if he returns to his country." The IJ granted Mr. Suherwanto's request for voluntary departure.

Mr. Suherwanto filed an appeal from the IJ's decision before the BIA. The BIA dismissed the appeal in a written opinion. It concluded that

> [t]he respondent's testimony reflects that the physical and sexual assaults he suffered were in the context of civil unrest and/or the behavior of criminal individuals, and thus do not meet the definition of persecution as it has been defined in the context of applications for asylum and withholding of removal.

The BIA also held that

> [t]he individuals who carried out these acts of mistreatment were not supported by the government of Indonesia. Additionally, those individuals were not members of a group that the government cannot control but rather criminal

6

participants in civil strife, anarchy, and, in the case of respondent's teacher who molested him, a sexual offender whose crimes were unrelated to persecution on account of an enumerated ground.

Mr. Suherwanto filed a timely petition for review on May 8, 2006. This Court has jurisdiction under 8 U.S.C. §1252.

## II

## A

Mr. Suherwanto contends that we should grant his petition for review because the BIA arbitrarily departed from its own precedent without announcing a principled reason for doing so. He argues that the BIA failed to follow the "on-point, published decision interpreting the meaning of 'persecution'" set forth in *In re O-Z- & I-Z-*, 22 I. & N. Dec. 23 (B.I.A. 1998) [hereinafter *Matter of O-Z-*]. We disagree.

The record shows that the BIA cited *Matter of O-Z-* in its opinion in this matter. The BIA concluded that "some of the past treatment he suffered in Indonesia was sufficiently serious to qualify as persecution, as that term is defined for purposes of asylum law. *See Matter of O-Z- & I-Z-*, 22 I&N Dec. 23, 25-26 (BIA 1998)." However, the physical assaults described by Mr. Suherwanto were the result of civil unrest and criminal conduct, and were unrelated to his claims of persecution on the ground of his homosexuality.

7

In dismissing Mr. Suherwanto's appeal, the BIA adopted the decision of the IJ regarding his factual findings and the applicable legal precedent with brief additional comments. We must review both the BIA's and IJ's opinions. *Fiadjoe v. Attorney General of United States*, 411 F.3d 135, 152-53 (3d Cir. 2005). We must uphold the BIA's and the IJ's determination if there is substantial evidence in the record to support it. *Abdille v. Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2001). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 483 (citing *Senathirajah v. I.N.S.*, 157 F.3d 210, 216 (3d Cir. 1998)). This is a deferential standard that requires that the findings be "upheld unless the evidence not only supports a contrary conclusion, but compels it." *Abdille*, 242 F.3d at 483-84. We must uphold the factual findings of the IJ "unless any reasonable adjudicator would be compelled to conclude to the contrary[.]" 8 U.S.C. § 1252(b)(4)(B).

An asylum applicant must establish that: (1) he or she is outside his or her country of nationality; (2) he or she is "unable or unwilling to return to" and "avail himself or herself of the protection of[] that country[;]" (3) such inability or unwillingness is "because of persecution or a well-founded fear of persecution[;]" and (4) such persecution is "on account of race, religion, nationality, membership in a particular social

group, or political opinion[.]" 8 U.S.C. § 1101(a)(42). "'[P]ersecution' is an extreme concept that does not include every sort of treatment our society regards as offensive." *Fatin v. I.N.S.*, 12 F.3d 1233, 1243 (3d Cir. 1993). In *Fatin*, this Court defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Id*. at 1240.

In *Matter of O-Z-*, the respondents's claims for asylum because of past persecution were based primarily on three physical assaults. Each assault was motivated because the respondents were Jewish. 22 I. & N. at 24. There was evidence that one of the respondents had been beaten after speaking at a political rally, anti-Semitic leaflets were left at his apartment, his apartment was broken into and vandalized, he had been beaten up on his way home from work by attackers warning him to leave the Ukraine because he was Jewish, and he and his son were physically assaulted at a bus stop by men making anti-Semitic remarks. *Id*. Additionally, one of the respondents recounted abuse that his son had endured at school on account of his Jewish background. *Id*. Finally, the respondents testified that they reported the burglary as well as the last two assaults to the police, but the police took no action. *Matter of O-Z-*, 22 I. & N. at 24.

In *Matter of O-Z-*, the BIA concluded that the three physical assaults, the repeated receipt of anti-Semitic fliers, and the humiliation the son received at school rose "to the level of persecution as contemplated by the Act." *Id*. at 25-26. Additionally, the Court

9

held that even though the incidents were not condoned by the government, three of the incidents were reported to the police and "[i]t appears that the Ukrainian Government was unable or unwilling to control the respondent's attackers and protect him or his son from the anti-Semitic acts of violence." *Id*. at 26.

Here, unlike the circumstances in *Matter of O-Z-*, there is no evidence in the record that the sexual abuse forced upon Mr. Suherwanto when he was nine years old was motivated by his teacher's belief that the child was a homosexual. Mr. Suherwanto asserted in the statement attached to his application for asylum that he was unaware of his homosexuality until he was sixteen years old. Mr. Suherwanto also testified that the physical assault he suffered during the rioters's conduct in the grocery store resulted from the fact that he was working for a Chinese grocery store owner. Mr. Suherwanto has not demonstrated that he was assaulted by the ethnic Indonesian vandals because he is a homosexual.

Mr. Suherwanto's contention that the discriminatory animus against homosexuals expressed by the village chieftain and the dean of his law school qualifies as past persecution also lacks merit. Under the law of this circuit, "the concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin*, 12 F.3d at 1240. This Court has "defined persecution as including 'threats to life, confinement, torture, and economic restrictions

10

so severe that they constitute a real threat to life or freedom.'" *Lukwago v. Ashcroft*, 329 F.3d 157, 168 (3d Cir. 2003) (quoting *Lin v. I.N.S.*, 238 F.3d 239, 244 (3d Cir. 2001)). The purely verbal hostility expressed by the law school dean and the chief of the village did not meet this standard. Because we conclude that a reasonable fact finder would not be compelled to reach a conclusion that Mr. Suherwanto suffered past persecution in Indonesia, we will deny the petition for review[1].

---

[1]Because Mr. Suherwanto has limited his request that we grant his petition for review regarding whether the BIA erred in concluding he has failed to demonstrate past persecution, we do not consider whether he established a well founded fear of future persecution, whether it is more likely than not that he would be persecuted in Indonesia, or whether he has demonstrated that he has met the applicable barriers of proof for protection under CAT. Accordingly, we decline to consider these issues because they have been waived. *Voci v. Gonzales*, 409 F.3d 607, 609 n.1 (3d Cir. 2005).