

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-2003

# Derevianko v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket 00-4193

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Derevianko v. Atty Gen USA" (2003). *2003 Decisions.* Paper 833.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/833

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 00-4193

———————

VLADIMIR DEREVIANKO,
                    Petitioner

v.

JANET RENO, ATTORNEY GENERAL OF
THE UNITED STATES,
                    Respondent

———————

ON APPEAL FROM THE UNITED STATES IMMIGRATION
AND NATURALIZATION SERVICE
Agency No. 0090-1 : A75-801-920

———————

Argued January 13, 2003

———————

Before: SCIRICA, BARRY, and SMITH, Circuit Judges

(Opinion Filed: January 31, 2003)

———————

Lawrence Spivak, Esquire (Argued)
Suite 803
299 Broadway
New York, NY 10007

Attorney for Petitioner

Aviva L. Poczter, Esquire (Argued)
John L. Davis, Esquire
Richard M. Evans, Esquire
Terri J. Scadron, Esquire
Matthew R. Hall, Esquire
Emily A. Radford, Esquire
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, D.C.  20044

Attorneys for Respondent

———————

OPINION

———————

BARRY, Circuit Judge

Vladimir I. Derevianko was born in Baltysk, Russia on December 12, 1962 and resided in the Ukraine from 1980 until the fall of 1997, when he left for the last time and fled to the United States.  Derevianko appeals from a November 20, 2000 decision of the Board of Immigration Appeals ("BIA") affirming the April 5, 2000 order of an Immigration Judge ("IJ") denying his application for asylum and withholding of removal.  At his administrative hearing, Derevianko testified that criminal charges pending against him in the Ukraine were trumped-up by corrupt government officials in retaliation for the past information and testimony he provided in government investigations of official corruption. He also testified that if he was returned to the Ukrainian authorities, he would be killed by the same enemies who fabricated the charges against him.  Although the IJ, in his written

2

opinion, expressly found Derevianko's testimony credible, including his testimony that the criminal charges pending against him in the Ukraine were fabricated, he nonetheless ruled that Derevianko's voluntary trips back to the Ukraine in 1996 and 1997 after visiting the United States and without requesting asylum indicated that he did not have the requisite well-founded fear of persecution to warrant a grant of asylum.

The BIA affirmed for essentially the reasons stated in the IJ's opinion. In reaching its conclusion, the BIA found that Derevianko had not questioned before the IJ the authenticity of the INTERPOL warrant pursuant to which he was arrested by the Immigration and Naturalization Service ("INS"), and thus the issue was not properly before the BIA. We have jurisdiction to entertain Derevianko's petition for review under 28 U.S.C. §§ 2342 and 2349. Because it is clear – both from the IJ's written opinion and from Derevianko's extensive testimony – that Derevianko raised the argument that the INTERPOL warrant was based on fabricated charges, we will reverse the Board's decision and remand for further consideration of Derevianko's application.

## I.

The primary evidence offered at Derevianko's hearing was his testimony describing his role as a government informant concerning organized crime and official corruption in the Ukraine from 1991 until he finally left the Ukraine for the United States in 1997. Derevianko's career as an informant began when he was recruited by the KGB while a student in the Ukrainian city of Sevastopol in the 1980s. After his graduation, Derevianko continued to provide information to the KGB concerning Ukrainian business connections

3

to foreign companies in his capacity as director of Sovhalish, a Soviet-Kuwaiti joint business venture that traded in foreign currency. It was in this capacity that Derevianko made an enemy of the Ukrainian KGB chief, a man named Kuntsevskiy, who blamed Derevianko for providing information that led to the confiscation of a large shipment of smuggled champagne. Derevianko was approached and threatened by two individuals working for Kuntsevskiy. Derevianko suspects that Kuntsevskiy was at least partly responsible for the fabricated criminal case now pending against him in Sevastopol.

When the Soviet Union fell in 1991, the Crimean branch of Sovhalish became the Tavricheskiy Trading House ("Tavricheskiy"). Derevianko stayed on as Director of Tavricheskiy, and continued to provide information to the KGB's successor in the Ukraine, the Ukraine State Security Service ("SBU"), about official corruption and organized crime. In the summer of 1992, soon after Derevianko took his position with Tavricheskiy, a man named Zelenchuk came to the Ukraine after being released from a Soviet prison camp in Siberia. In December of 1992, two men attempted to kidnap Derevianko. Derevianko assumed that Zelenchuk was responsible because soon thereafter, he offered Derevianko "protection." Derevianko accepted the offer at the SBU's urging in order to learn more about Zelenchuk's criminal activities.

In the fall of 1994, Derevianko became involved in an investigation by the Ukraine prosecutor's office of several illegal international metals transactions by Zelenchuk which resulted in the arrest of Zelenchuk's closest aide and some local Sevastopol bankers. Since that time, there was open hostility between Derevianko and Zelenchuk. Indeed, Derevianko

4

attributes his father's death – his father was found dead at home in December of 1994 clutching a telephone receiver – to repeated telephone death threats made by Zelenchuk. Though no formal investigation of his father's death was ever conducted, Derevianko was later informed by a friend in the SBU that Zelenchuk was behind the threats. After his father's death, Derevianko ceased providing information to the SBU for fear of further reprisals. Nonetheless, a few months later, somebody fired a machine gun at him as he was walking from his office to his car.

Even after he stopped working for the SBU, Derevianko's troubles with Zelenchuk continued to escalate. Zelenchuk, having become deputy director of the Ukraine Social Bank, had developed connections with the vice chairman of the Sevastopol prosecutor's office. In March of 1995, Zelenchuk arranged for the prosecutor's office to initiate an investigation into Tavricheskiy's dealings in an attempt to prevent Derevianko from providing any further information about Zelenchuk's criminal activities. Apparently not fazed by Zelenchuk's threats, attacks and threatened prosecution, however, in May of 1996, Derevianko served as a primary witness in an investigation of Zelenchuk's illegal metals transactions by the Sevastopol office charged with fighting organized crime. Zelenchuk, however, utilized his official connections to have the investigation terminated. After he testified, Derevianko was warned by the deputy head of the SBU that it was likely that Zelenchuk and his associates would make another attempt on Derevianko's life.

Knowing that neither the Sevastopol police nor the corrupt SBU could protect him from Zelenchuk, Derevianko moved from Sevastopol to Kiev (the largest city in the

5

Ukraine) in August of 1996. One month later, Derevianko's mother informed him that it had been reported on the television news that the Sevastopol prosecutor's office had lodged a criminal case against him. Though Derevianko was unable to determine the nature of the charges against him, he assumed that they falsely accused him of wrongdoing as the Director of Tavricheskiy. Only after he was arrested by the INS pursuant to the INTERPOL warrant in 1998 did Derevianko learn that the warrant was based not only on false fraud allegations but also falsely alleged that he had been involved in kidnaping, extortion, and possession of a firearm.

Despite his awareness of the trumped-up fraud allegations, Derevianko testified that he felt safe in his Kiev apartment because he thought it would be difficult for Zelenchuk or his connections in the Sevastopol prosecutor's office to find him in Kiev. In November of 1996, the same month Derevianko traveled to the United States to attend a one-week humanitarian workshop, the daily newspaper Pravda Ukraine published an article accusing Zelenchuk of being unqualified for his official position and being associated with organized crime, all based on information provided by Derevianko. Derevianko testified that Zelenchuk's cronies beat up two Tavricheskiy employees as a result of the newspaper article and that Zelenchuk resumed telephone threats to his mother.

In February of 1997, Derevianko returned to Kiev after a one-week business trip to the United States and learned that the Sevastopol authorities had issued a warrant for his arrest. He was unable to learn any details about the nature of the charges. About this same time, in early 1997, a reporter's interview with Derevianko was reprinted in the evening

6

Sevastopol newspaper. In the article, Derevianko accused Zelenchuk of criminal activity and mentioned Zelenchuk's arrest for rape of a minor.

After this interview was published, Derevianko took two additional business trips to the United States, in April and July of 1997, respectively. He stayed for 10 days in April and a month in July, returning to Kiev via Moscow both times. Because he knew, albeit without specifics, of the false criminal case pending against him in Sevastopol and because the interview in which he openly accused Zelenchuk of various criminal acts had been published, Derevianko only dared return to Kiev for less than a day on his last visit there in September 1997. After this brief stop in Kiev to finalize his departure arrangements, Derevianko never returned to the Ukraine. While he had, by October 1997, managed to transfer all of his business activities to the United States, Derevianko testified that he was still hoping that the official corruption situation in the Ukraine might improve after the upcoming presidential elections such that he could return home. Because the elections yielded little change in the prevailing corrupt government in the Ukraine, however, Derevianko remained in the United States.

After arriving here in the fall of 1997, Derevianko took only two short trips abroad – one to the Dominican Republic for five days in January of 1998 to renew his immigration status, and one four-day trip to Hungary to meet with an attorney to learn what he could about the trumped-up criminal case pending against him in Sevastopol. At the meeting in Hungary, Derevianko's attorney reported that he had been unable to learn anything about the criminal case; indeed, he told Derevianko that the Sevastopol prosecutor's office had

7

denied there was a criminal case pending against him.

Derevianko was arrested by the INS on February 3, 1999 pursuant to an INTERPOL warrant requested by the Ukranian authorities. The documents attached to the INTERPOL warrant detailing the factual basis for the arrest request indicate contradictory accounts of the crimes alleged against Derevianko. The attached arrest warrant from the Sevastopol prosecutor's office, dated February 6, 1997, charges Derevianko with the misuse of certain funds in his position as Director of Tavricheskiy and the concealment of documents relating to the alleged fraud. Undated supplemental charges signed by the "Colonel of Militia" of the Sevastopol Administration of the Ukrainian Department of Internal Affairs, however, not only restate the same fraud charges, but go on to allege that Derevianko orchestrated a kidnaping in August of 1994 and illegally possessed a firearm. Derevianko first learned of the nature of the charges when the INS allowed him to review these documents after his arrest.

At the hearing before the IJ, Derevianko testified that the charges were completely fabricated. He went on to explain that only when he was able to review the INTERPOL warrant and accompanying documents did he understand the nature and severity of the trumped-up charges against him. He further testified that he had not, until then, realized that Zelenchuk's connections were so influential that they could arrange for an INTERPOL warrant based on false charges to issue. He added that he had little doubt that if he was turned over to the Ukranian authorities by the INS pursuant to the INTERPOL warrant he would be killed while in custody.

8

In his written opinion, dated April 5, 2000, the IJ expressly found Derevianko's testimony to be "believable, consistent, and detailed." The IJ further found that the persecution Derevianko suffered in retaliation for his testimony against official corruption would qualify as persecution based on his political beliefs. The IJ nonetheless concluded that Derevianko's fear of persecution was not sufficiently well-founded to warrant a grant of asylum because his several voluntary return trips to the Ukraine in late 1996 and 1997 and his failure to seek asylum when in this country showed that he did not have the requisite well-founded subjective fear of persecution. The IJ's opinion did not address the 1999 Ukraine country reports from the State Department and Amnesty International submitted by Derevianko as exhibits. Both reported that official corruption was rampant in the Ukraine, and that the torture and beating of incarcerated individuals was commonplace, resulting in the death of several inmates while in official custody.

The BIA upheld the IJ's determination in a three-page opinion which essentially restated the IJ's reasoning. The BIA did not address Derevianko's argument that the IJ failed to consider his testimony that he would certainly be persecuted if delivered into the custody of Sevastopol authorities pursuant to the INTERPOL warrant rather than returning to the Ukraine voluntarily. It did find, wrongly given Derevianko's testimony, that "[t]here is no indication that new charges were filed with the notification from INTERPOL," and that there was no new warrant for his arrest. 4A. It also reasoned, again wrongly, that it was not appropriate to consider the authenticity of the INTERPOL documents because Derevianko had not questioned their authenticity before the IJ. And, importantly, the BIA's

9

opinion made no mention of the IJ's express finding that Derevianko's testimony was detailed, consistent and believable.

## II.

Derevianko advances three arguments on appeal: (1) that the BIA's determination that he did not have a well-founded fear of persecution was not supported by substantial evidence; (2) that the BIA's determination that he waived his claim for relief pursuant to the Convention Against Torture on appeal was error; and (3) that the BIA abused its discretion in denying his motion to reopen the record. For the reasons stated in the BIA's opinion, we reject his second and third arguments. For the reasons which follow, we accept his first argument and remand for further proceedings.

**A.**

Under the well-established standard of review of BIA determinations, we must sustain the BIA's decision if it is supported by substantial evidence, often defined as "more than a mere scintilla and . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998). In other words, we may reverse the BIA's factual determinations concerning Derevianko's eligibility for asylum and withholding of removal "only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed." INS V. Elias-Zacharias, 502 U.S. 478, 480 (1992).

An alien is eligible for a discretionary grant of asylum only if unwilling to return to his or her country of nationality "because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(a). If the alien's application relies on fear of future persecution, he or she must show a well-founded subjective fear, which is also "supported by objective evidence that persecution is a reasonable possibility." Lin v. INS, 238 F.3d 239, 244 (3d Cir. 2001). The alien has a higher burden to prove eligibility for the non-discretionary withholding of removal – there must be a "clear probability" that his or her "life or freedom would be threatened." 8 U.S.C. § 1231(b)(3)(A); Chang v. INS, 119 F.3d 1055, 1059 (3d Cir. 1997).

The IJ expressly found, and the BIA did not disagree, that for purposes of Derevianko's asylum claim, the persecution alleged by him as a result of his "whistle-

11

blowing" against official corruption would constitute persecution due to his political opinion. Thus, the only issue remaining before the IJ was whether Derevianko had established that he had either been a past victim of persecution or that he had a "well founded fear" that he would be persecuted by Zelenchuk and others if he returned to the Ukraine. Accordingly, the only issue on appeal is whether the BIA's determination that Derevianko had neither suffered past persecution nor had a well-founded fear of future persecution was supported by substantial evidence.

It is clear that one crucial aspect of the BIA's opinion is not supported by substantial evidence, but rather is contradicted by the clear record evidence – the BIA's finding that Derevianko had not raised the issue of whether the INTERPOL arrest warrant was authentic. Derevianko clearly raised this issue several times in the course of his testimony before the IJ. He testified on direct examination that the criminal charges pending against him in Sevastopol and the corresponding arrest warrant had been fabricated by Zelenchuk and his cohorts in retaliation for his testimony concerning Zelenchuk's illegal metals transactions and the published interview in which he accused Zelenchuk of criminal activity. AR 405, 410-11, 418.[1] Then, in explaining how the authorities could not protect him from these powerful enemies, Derevianko stated: "the reason for that is they . . . got international organizations [INTERPOL] involved in the war against me. . . . They . . . weren't even afraid to direct or send fabricated documents to INTERPOL." AR 413.

---

[1] Citations in this form are to the Certified Administrative Record submitted by the parties on appeal.

On cross-examination, Derevianko reiterated that the criminal charges against him were fabricated and that the Sevastopol prosecutor's office had falsely informed his attorney that no criminal case was pending because no official in Sevastopol "wants to take responsibility for the documents that have been sent to INTERPOL." AR 418. Also on cross-examination, after denying that he had been involved in any of the criminal activity charged in the documents attached to the INTERPOL warrant (which Derevianko testified he only saw after he was arrested by the INS), AR 422-23, Derevianko noted specific deficiencies in the Sevastopol prosecutor's documents attached to the INTERPOL warrant, stating "I thought it was a mistake, because the signature is absent and because they are put together in an unprofessional and unqualified manner. In the arrest warrant, one criminal case number is listed. In the extract from the criminal case – another number." AR 433.

And finally, on re-direct, in his clearest explanation of how the ability of his enemies to issue an INTERPOL arrest warrant based on fabricated information demonstrated their power and the depth of the danger he would be in if he returned to the Ukraine, Derevianko testified:

> They decided to use Ukrainian INTERPOL, American INTERPOL, in order to get me in the Ukraine – bring me to the Ukraine. And taking into account that those people, at least some of them, still have power, and have serious connections in the upper echelons of power, and also on noting that they were not afraid to introduce this kind of evidence to INTERPOL, it gives me reasons to suppose that Kuntsevskiy is using his connections with the security service of the Ukraine.

AR 487. Indeed, not only did Derevianko testify that the documents underlying the

13

INTERPOL warrant were fabricated and that the criminal charges against him were false, but the IJ's opinion itself states that Derevianko testified that the criminal charges against him were trumped-up, that the Sevastopol prosecutor's office falsely told Derevianko's lawyer that no such charges were pending, and that the documents underlying the INTERPOL arrest request were fabricated. AR 89-91. Moreover, the IJ expressly found this testimony to be "believable, consistent, and detailed." AR 94.

In light of this record evidence, it is clear that the BIA wrongly concluded that Derevianko had not raised to the IJ the argument that the documents underlying the INTERPOL warrant were fabricated. The BIA was correct, however, that the IJ's ultimate conclusion did not rely on his apparent determination that the INTERPOL arrest request was based on fabricated documents and trumped-up criminal charges. Rather, for the IJ (and, in turn, for the BIA), the fact that defeated Derevianko's claim of a well-founded fear was his voluntary return to the Ukraine after two 10-day trips to the United States in April and July of 1997. The IJ reasoned that if Derevianko's subjective fear of persecution was, indeed, well-founded, he would not have returned to Kiev in April or July of 1997, after he had heard that the Sevastopol authorities had issued a warrant for his arrest, but would have instead remained in the United States and applied for asylum immediately. Cf. Castillo v. INS, 951 F.2d 1117, 1122 (9th Cir. 1991) (asylum applicant lacked well-founded fear where he remained in Nicaragua for five and one-half years after being threatened by Sandanistas); Rodriguez-Rivera v. INS, 848 F.2d 998, 1006 (9th Cir. 1988) (no well-founded fear where applicant "continued to live undisturbed" in El Salvador for fourteen

14

months after being threatened by guerillas).

There is one crucial flaw in the reasoning of IJ, however, which renders his (and, by extension, the BIA's) conclusion "unreasonable" and, thus, unsupported by substantial evidence. The IJ failed to recognize the difference between Derevianko returning to the Ukraine via Moscow *voluntarily*, as he did when he returned to Kiev twice in 1997, and being placed by INS into the custody of the Ukrainian authorities pursuant to false allegations in an INTERPOL warrant of which he did not know when he returned to the Ukraine. To deport Derevianko into Ukrainian official custody would guarantee that he would not be able to evade those individuals responsible for creating the fabricated criminal case against him in Sevastopol, as he had by hiding in Kiev. Indeed, because the IJ accepted as credible Derevianko's testimony that the charges against him were trumped-up and the documents underlying the warrant were fabricated, placing him in the custody of the Ukrainian authorities pursuant to a false INTERPOL warrant would in itself constitute persecution, even without considering reports from the State Department and Amnesty International describing the substantial risks of violence and death to those incarcerated in the Ukraine. The BIA itself has recognized that an outstanding arrest warrant on trumped-up charges constitutes powerful evidence that the authorities in an applicant's home country have the "inclination and ability" to persecute the applicant. In re A- S-, 21 I. & N. Dec. 1106, 1120 (1998) ("it is reasonable to conclude that government authorities and political party members who targeted the respondent in the past continue to have the inclination and the ability to punish the respondent for his political beliefs . . . especially . . . considering

15

that the respondent fled Bangladesh while a warrant for his arrest (on allegedly trumped-up charges) remains outstanding").

Ultimately, it is difficult to see how any reasonable fact finder could conclude that Derevianko would not have well-founded fear of persecution if he is being deported into the custody of corrupt authorities who have brought false criminal charges against him. Cf. Blanco-Lopez v. INS, 858 F.2d 531,534 (9th Cir. 1988) (reversing INS denial of asylum where false criminal charges were still pending against applicant in El Salvador). And here, we note, wholly apart from Derevianko's "believable, consistent, and detailed" testimony, there appears to be an inconsistency between the two separate criminal charging documents attached to the INTERPOL warrant and the various official signatures on the original documents seem suspiciously similar.

If the BIA finds Derevianko's testimony on these subjects credible, giving due deference to the IJ's finding below that his testimony was, indeed, credible, see In re A- S-, 21 I. & N. Dec. at 1109 ("it is . . . well established that . . . the Board accords deference to the Immigration Judge's findings concerning credibility and credibility-related issues"), Derevianko would unquestionably face, at least in our view, the "reasonable possibility" of future persecution required to be eligible for asylum. See Lin v. INS, 238 F.3d 239, 244 (3d Cir. 2001). Indeed, the BIA could well consider on remand whether his evidence would satisfy the more stringent burden of proof for eligibility for the non-discretionary withholding of removal under 8 U.S.C. § 1231(b)(3)(A) – that his deportation into official custody pursuant to false criminal charges constitutes "a 'clear probability' of a threat to

16

life or freedom." <u>Chang v. INS</u>, 119 F.3d 1055, 1059 (3d Cir. 1997) (quoting <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 428 (1987)).

**B.**

One final note.  We concluded, above, that the BIA did not abuse its discretion in denying Derevianko's motion to reopen the record to allow the IJ to consider an affidavit from a Ukrainian government official submitted on Derevianko's behalf.  The proffered affidavit corroborated Derevianko's testimony that he likely will be killed if returned to the Ukraine.  The Board correctly recognized that the affidavit would have had no effect on the IJ's decision because it would simply have corroborated Derevianko's testimony, but the IJ had accepted that testimony as credible without corroboration.

The BIA may, however, deem it appropriate to reconsider the motion to reopen to consider the affidavit on remand.  Because the affidavit is corroborative of Derevianko's testimony that the criminal charges against him were trumped-up by his enemies in the Ukraine and that he would face death if deported into official custody, it is directly material to the issue on remand.  <u>See</u> 8 C.F.R. § 3.2 (c)(1).

**III.**

For the foregoing reasons, we will vacate the determination of the BIA and remand for further proceedings not inconsistent with this opinion.

TO THE CLERK OF COURT:

17

Kindly file the foregoing opinion.


/s/ Maryanne Trump Barry
Circuit Judge