**Oleg KANIVETS, Petitioner**

**v.**

**William RILEY et al., Defendants.**

**No. CIV.A. 03–5377.**

United States District Court,
E.D. Pennsylvania.

Oct. 3, 2003.

---

Lawrence H. Rudnick, Philadelphia, PA, for Oleg Kanivets, Petitioner.

Richard M. Bernstein, U.S. Attorney's Office, Philadelphia, PA, for Bill Riley, as Regional Director Immigration and Customs Enforcement Department of Homeland Security, or His Successor or Assigns, Board of Immigration Appeals, Executive Office of Immigration Review, Respondents.

### MEMORANDUM & ORDER

KATZ, Senior District Judge.

Before the court is Oleg Kanivets' requests that the court stay his removal from the United States while the court considers his Petition for a writ of habeas corpus under 28 U.S.C. § 2241. Upon consideration of the proposed findings of fact and conclusions of law and the arguments offered by both parties at a hearing, the court grants Petitioner's request for a stay of removal.

### I. Factual Background

Petitioner Oleg Kanivets is of Russian ethnicity and is a citizen and national of the Kyrgyz Republic, known informally as Kyrgyzstan. On January 21, 1998, Kanivets left Kyrgyzstan for the United States, where he had authorization to stay for approximately one year. On July 9, 1999, Kanivets applied for asylum and withholding of removal, claiming that he had a well-founded fear of persecution in Kyrgyzstan based on his Jewish ancestry and religion.

To support his claim of past persecution on account of religion in Kyrgyzstan, Kanivets testified that Kyrgyz men had physically assaulted him on two occasions, threatening him both times with further harm and death if he did not leave Kyrgyzstan and go to Israel. Kanivets and his family received several letters and phone calls at home, threatening them with unless they moved to Israel. Kanivets stated that after his sister left Kyrgyzstan for Israel in 1997, the threatening notes to his family "became worse." Petitioner's Proposed Findings ¶ 2. When the apartment that Kanivets shared with his mother was vandalized, the apartment door defaced with a Star of David. Kanivets also claimed that he had been discriminated against at work because of his Jewish religious affiliation, culminating in losing his job as a dental technician in May 1997.

On September 30, 1999, Kanivets' application for asylum and withholding of removal was denied. After an appeal, an Immigration Judge ("IJ") heard testimony and denied the application on November 29, 2000. The IJ treated Kanivets' testimony as to the incidents of assault, vandalized property, and death threats as credible, but found that these incidents were not sufficient to establish that he should be granted asylum. The IJ characterized these incidents as examples of "societal violence" against Russians, who comprise ethnic minority groups in many former Soviet Socialist Republics. *See* IJ Opinion at 6–7. The IJ pointed to the lack of evidence from Petitioner, his expert witness, the State Department, and Amnesty International that Jewish people in Kyrgyzstan are persecuted at the hands of the government or by groups that the government is unwilling or unable to control. *Id.* at 3–4.

Kanivets appealed to the Board of Immigration Appeals (BIA) on December 29,

2000. The BIA dismissed the appeal on October 28, 2002 without opinion. Kanivets filed a Motion to Reopen his application for asylum and withholding of removal in order to file an application for adjustment of status to permanent resident on November 21, 2002.[1] When the BIA denied this Motion to Reopen on July 31, 2003, the order of removal issued against Kanivets became final. On September 11, 2003, the Immigration and Customs Enforcement ("ICE") division of the Bureau of Citizenship and Immigration Services issued a notice to Kanivets to surrender, apparently on October 8, 2003,[2] to be deported to Russia after 90 days' detention. Kanivets filed this Petition for a Writ of Habeas Corpus on September 24, 2003.

## II. Discussion

### A. Jurisdiction

■ This court has jurisdiction to hear Kanivets' Petition for a Writ of Habeas Corpus. See I.N.S. v. St. Cyr, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (holding that neither Antiterrorism and Effective Death Penalty Act nor Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) repealed district courts' jurisdiction to review aliens' habeas petitions filed under 28 U.S.C. § 2241(c)). The Third Circuit has clarified that this

holding applies to habeas petitions filed by non-criminal aliens:

> Following St. Cyr, it is incontrovertible that aliens being deported on the basis of certain criminal convictions would still have that right [to seek habeas relief in district court]. We see no reason to conclude that non-criminal aliens should be treated differently. The Supreme Court has made it quite clear that there are two rationales in support of the conclusion that habeas is preserved for aliens subject to a final order of deportation. The first is "the strong presumption in favor of judicial review of administrative action . . . ." St. Cyr, 533 U.S. at 297–98, 121 S.Ct. at 2278. The second is "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." Id.

Chmakov v. Blackman, 266 F.3d 210, 213 (3d Cir.2001).

■ Although the government does not raise it, there may be a question as to whether Petitioner is eligible to apply for asylum under Section 2241 because when he filed his Petition he was not literally in custody. The statute provides in relevant part: "The writ of habeas corpus shall not extend to a prisoner unless (1) He is in custody under or by color of authority of the United States or is committed for trial before some court thereof . . . ." 28 U.S.C.

---

1. On August 27, 2003, Kanivets filed both a Motion to Reconsider with the BIA and a Petition for Review with the Third Circuit Court of Appeals. The issue on appeal to the Third Circuit does not involve Kanivets' asylum claim; it challenges the BIA's decision to deny Kanivets the chance to file an application for adjustment of status based on the fact that he failed to leave the United States during his period of voluntary departure. Kanivets also filed a request for a stay of removal with the Court of Appeals on September 18, 2003, pending their resolution of the adjustment of status issue. Petitioner asserts that the Court of Appeals has not yet ruled on his request for a stay. See Petitioner's Proposed

Findings ¶ 24. As this request for a stay is premised on a different substantive claim, there is no risk of inconsistent rulings between this court and the Court of Appeals on the decision to grant a stay.

2. Kanivets submitted copies of two Notices to the court as Exhibit J to his Petition. Both notices were issued by the I.N.S. on September 11, 2003 telling him to report to the same address for detention pending deportation, but one instructs him to report on October 1, 2003 and the other to report on October 8, 2003.

§ 2241(c). The Supreme Court has held that for purposes of habeas corpus jurisdiction, custody is measured at the time the person filed the habeas petition. *See Carafas v. LaVallee,* 391 U.S. 234, 238, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). When Kanivets filed this Petition on September 24, 2003, he was living at home, but subject to an order from Immigrations and Customs Enforcement to surrender for detention pending deportation sometime in the following two weeks. Where a person faces potential custody, such as release on parole subject to incarceration if parole conditions are not met, courts have found that the custody requirement for habeas is satisfied. *See Hensley v. Municipal Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Poodry v. Tonawanda Band of Seneca Indians,* 85 F.3d 874, 894 (2d Cir.1996); *Pringle v. Ct. of Common Pleas,* 744 F.2d 297, 299 (3d Cir.1984) ("[T]he inquiry into whether a petitioner has satisfied the jurisdictional prerequisites for habeas review requires a court to judge the 'severity' of an actual or potential restraint on liberty"). Because Petitioner is subject to the ICE's Notice to surrender for detention pending deportation, the court finds that Petitioner may seek a Writ of Habeas Corpus pursuant to Section 2241.

### B. Petitioner's Request for a Stay of Removal

██ There is disagreement among the United States Courts of Appeal as to what standard to apply when considering an alien's request to stay removal pending habeas review. The majority of circuits that have addressed the issue have applied a standard similar to that used to evaluate a request for preliminary injunctions, while at least one circuit has found that Section 242(f)(2) of the Immigration and Naturalization Act imposes a heightened standard of review. *See* INA § 242(f)(2), 8

U.S.C. § 1252(f)(2) ("Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law."); *Andreiu v. Ashcroft,* 253 F.3d 477, 479–83 (9th Cir. 2001) (en banc) (holding that Section 1252(f)(2) only applies when courts are asked to enjoin removal, not temporarily stay removal); *Bejjani v. I.N.S.,* 271 F.3d 670, 687–89 (6th Cir.2001) (same); *Mohammed v. Reno,* 309 F.3d 95, 97–100 (2d Cir.2002) (same); *Bin Weng v. Attorney General,* 287 F.3d 1335 (11th Cir.2002) (per curiam) (adopting heightened standard of review under Section 1252(f)(2) for issuing a stay of removal). This split in the circuits prompted a challenge the Eleventh Circuit's adoption of the higher "clear and convincing evidence" standard in *Kenyeres v. Ashcroft,* —— U.S. ——, ——, 123 S.Ct. 1386, 1387, 155 L.Ed.2d 301 (2003). Justice Kennedy, writing alone as a Circuit Justice, found that although the United States Supreme Court should decide whether Section 1252(f)(2) applies to a stay of removal, *Kenyeres* was not an appropriate case to decide the issue because the petitioner would not meet even the lower standard. *See Kenyeres* at 1388. Recently, the First Circuit joined the Sixth, Second, and Ninth Circuits in finding that Section 1252(f)(2) does not apply in this situation. *See Arevalo v. Ashcroft,* 344 F.3d 1, 6, 9 (1st Cir.2003).

The Third Circuit has not addressed the issue, but at least two district courts in our circuit have held that Section 1252(f)(2) does not apply to a request to stay removal. *See Kahn v. Elwood,* 232 F.Supp.2d 344, 347–50 (M.D.Pa.2002) (holding that proper considerations for issuing a stay of removal are identical to those for issuing a preliminary injunction: (1) the likelihood

of success on the merits; (2) whether there the moving party will be irreparably injured if the stay is denied; (3) whether the party opposing the stay will suffer substantial injury if stay is issued; and (4) whether granting the stay would be in the public interest); *U.S. ex rel. Kovalev v. Ashcroft,* 223 F.Supp.2d 688, 697–98 (E.D.Pa.2002) (same). This court will follow these two decisions and the majority of the circuits that have addressed the issue in holding that Section 1252(f)(2) does not apply to stay of removal. Therefore, the court will evaluate Kanivets' request for a stay based on the likelihood of his success on the merits; whether he will be irreparably injured if the stay is denied; whether the government will suffer substantial injury if a stay is issued; and whether granting the stay would be in the public interest.

### 1. Likelihood of Success on the Merits

▮▮ Kanivets will succeed on his Petition for a Writ of Habeas Corpus only if he shows that there were legal or constitutional errors in the denial of his application for asylum and withholding of removal that culminated in a final order of removal. As the Second Circuit has held, "federal jurisdiction over Section 2241 petitions does not extend to review of factual or discretionary determinations." *Sol v. I.N.S.,* 274 F.3d 648, 651 (2d Cir.2001) (citing *Finlay v. I.N.S.,* 210 F.3d 556, 557 (5th Cir.2000); *Bowrin v. U.S. I.N.S.,* 194 F.3d 483, 490 (4th Cir.1999); *Catney v. I.N.S.,* 178 F.3d 190, 195 (3d Cir.1999)). The Third Circuit recently held, however, that legal errors within the scope of habeas review include "the erroneous application or interpretation of statutes," so that a "district court's habeas jurisdiction encompasses review of the BIA's application of legal principles to undisputed facts." *Ogbudimkpa v. Ashcroft,* 342 F.3d 207, 222 (3d Cir.2003) (citing *St. Cyr,* 533 U.S. at 302, 121 S.Ct.

2271). There are several issues involving the application of legal principles to undisputed facts that Kanivets raises in his Petition that require further review by this court. Although the court makes no findings as to the existence of legal or constitutional error, for purposes of Kanivets' request to stay his removal pending review of his Petition, the court finds that Kanivets has a reasonable likelihood of success in showing that the IJ committed legal error on the following issues.

First is the IJ's reliance on the State Department *Country Report* to refute credible testimony of the Petitioner as to his own experience with anti-Semitic violence in Kyrgyzstan. In finding that Kanivets was not the subject of past persecution based on religion and does not face a reasonable possibility of such persecution if he were to return, the IJ stated that "The objective evidence in this case fails to show that Jewish people in Kyrgyzstan suffer persecution either at the hands of the government of that country, or by groups that the government is unable or unwilling to control." IJ Opinion at 3. The objective evidence cited by the IJ consists primarily of a U.S. Department of State Country Report describing conditions in Kyrgyzstan. According to the IJ, that report indicates that "there is no evidence of widespread societal discrimination or violence against members of religious groups other than the majority Moslem population .... A small Jewish population meets in the capital of Bishkek, although it does not have a rabbi." IJ Opinion at 3. The IJ states that although Jews are leaving Kyrgyzstan in small but steady numbers, primarily for Israel, the State Department does not report any instances of Jewish people being singled out for acts of violence, or clear-cut tradition of anti-Semitism in Kyrgyzstan. *See id.* The IJ also relies on the fact that Amnesty Interna-

tional does not report any anti-Semitic action by the Kyrgyz government or by groups that the government cannot control. *See id.* at 4.

There is at least a reasonable possibility, however, that this objective evidence cited by the IJ should not counter Kanivets' credible testimony as to two physical assaults, death threats, vandalizing of his family apartment, and the anti-Semitic character of all of these acts. Although the Country Reports published periodically by the State Department are trustworthy and often cited in asylum cases, courts have recognized that the factual summaries and assessments in the Reports are sometimes colored by diplomatic relations and are at best generalizations of the human rights situations in foreign countries. *See Galina v. I.N.S.*, 213 F.3d 955, 959 (7th Cir.2000) ("The country report is evidence and sometimes the only evidence available, but the Board should treat it with a healthy skepticism, rather than, as is its tendency, as Holy Writ."); *Shah v. I.N.S.*, 220 F.3d 1062, 1069 (9th Cir.2000). In *Li Wu Lin v. I.N.S.*, 238 F.3d 239 (3d Cir. 2001), the Third Circuit held that the BIA improperly relied on a letter from the State Department in refuting the credibility of the alien's testimony as to his persecution in China. *See id.* at 246 ("[T]he Board's [BIA's] decisions cannot be sustained simply by invoking the State Department's authority."); *see also Ezeagwuna v. Ashcroft*, 301 F.3d 116 (3d Cir.2002) (criticizing I.N.S. reliance on letter from State Department to refute credibility of asylum applicant). Given the IJ's seeming reliance on the Country Report and the fact that the regulations governing asylum provide that an applicant's credible testimony "may be sufficient to sustain the burden of proof without corroboration," *see* 8 C.F.R. § 208.13(a), the court finds that Kanivets is reasonably likely to show that the IJ committed legal error in using the Country Report to refute credible testimony of the Petitioner as to anti-Semitic violence in Kyrgyzstan.

█ Second is Petitioner's argument that the IJ erred in finding that the undisputed facts did not support a finding of past persecution and then shifting the burden of proof to Petitioner. When an applicant demonstrates past persecution, there is a presumption that he has a well-founded fear of future persecution and the burden shifts to the government to prove by a preponderance of the evidence that country conditions have changed such that he no longer has a reasonable fear of persecution if he were to return. *See* 8 C.F.R. § 208.13(b)(1)(i). To show that he suffered past persecution, an applicant must show that he endured more than "a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *See Mikhailevitch v. I.N.S.*, 146 F.3d 384, 390 (6th Cir.1998). *See also Fatin v. I.N.S.*, 12 F.3d 1233, 1240 (3d Cir.1993) (characterizing persecution as extreme behavior such as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom."). The persecution must be on account of race, religion, nationality, membership in a particular social group, or political opinion and be perpetrated by the government or by private persons that the government is unwilling or unable to control. *See* 8 U.S.C.A. § 1101(a)(42)(A); *Gao v. Ashcroft*, 299 F.3d 266, 271–72 (3d Cir.2002). The IJ characterized the motivations of the persons that attacked and threatened Kanivets as focused on Petitioner's Russian ethnicity rather than his religion. *See* IJ Opinion at 6 ("There is insufficient evidence to warrant the conclusion that the respondent suffered persecution in Kyrgyzstan on account of his Jew-

ish ethnicity. Arguably, [Kanivets] may have been the victim of societal violence based upon the perception that he was a member of the Russian-speaking minority that remained in the country after the collapse of the Soviet Union."). The IJ also found that the acts perpetrated against Kanivets were carried out by private Kyrgyz citizens rather than the government or groups that the government was "unwilling or unable to control." *See id.* ("As noted above, there is no evidence that Jewish people have been targeted for persecution in Kyrgyzstan by the government or groups that it cannot control on account of their ethnicity ... there is insufficient evidence in this record to show that the government of Kyrgyzstan condones or instigates persecution of those perceived to be Russians.").

According to his credible testimony, Kanivets was verbally harassed about his Jewish ancestry and religion and threatened with death if he did not leave for Israel, his apartment was vandalized and defaced with anti-Semitic symbols, and he was physically assaulted twice by persons who told him they would harm him further if he did not leave for Israel. If these facts are undisputed, it may have been legal error for the IJ find that this did not meet the legal standard for persecution on account of religion, as the religious motivation in these incidents seems very clear. Kanivets also offered testimony that the acts of persecution were perpetrated by persons whom the government was unwilling or unable to control. Although the IJ apparently found such testimony credible, he held that this did not meet the legal standard for showing persecution related

to government acts or omissions. Kanivets testified that he reported threatening phone calls to the police, but they failed to take any action. He also reported the April 17, 1997 assault where four Kyrgyz men called him a derogatory name for Jews and threatened to kill him, but the police told Kanivets that there was nothing they could do because the assault was not serious. In addition, after learning he was Jewish, the police told him that if he was dissatisfied with Kyrgyzstan laws he should move to Israel. Kanivets did not report this second assault by the same four men in November 1997 because of his experience with the police. He also did not report to police that the apartment where he and his mother lived was vandalized in March 1997 because according to Kanivets the police did not generally get involved in such cases. The fact that Kanivets reported most of the incidents to the police is relevant to determination of whether he has met the legal standard. *See Baballah v. Ashcroft,* 335 F.3d 981, 991 (9th Cir.2003) ("Only where non-governmental actors are responsible for persecution do we consider whether an applicant reported the incidents to police, because in such cases a report of this nature may show governmental inability to control the actors."). There is at least a reasonable likelihood that the IJ erred in applying undisputed facts to the legal standard for what constitutes past persecution on account of religion, in terms of the extent of a connection required between acts of persecution and religious motivations and between those acts and the government or groups the government is unwilling to control.[3]

---

**3.** Although the facts of each case must be scrutinized carefully, there are several cases that upon a preliminary evaluation, appear at least partly analogous to Mr. Kanivets' situation. *See, e.g., Chouchkov v. I.N.S.,* 220 F.3d 1077 (9th Cir.2000) (reversing BIA's decision

to deny asylum to a Russian Jew who was persecuted for his political opinions and religion as evidenced by repeated death threats and assaults on him and his family); *Galina v. I.N.S.,* 213 F.3d 955 (7th Cir.2000) (granting asylum for Latvian resident who was Jew-

■ Third, the Petitioner disputes the IJ's finding that his application for asylum was time-barred. IIRIRA imposed a one-year statute of limitations for filing an application for asylum. *See* 8 U.S.C. § 1158(a)(2)(B). The final rule interpreting this requirement, however, states that changed circumstances in the country that affect eligibility for asylum can extend the period of application and "delayed awareness" of such changes can be considered in evaluating what is a reasonable period for filing a late application. *See* 8 C.F.R. § 208.4(a)(4)(ii) (2001). Kanivets presented evidence to the IJ that conditions in Kyrgyzstan had deteriorated since he left the country in January 1998. It was not until his mother joined him in the United States in April 1999 that Kanivets decided that he could not return to Kyrgyzstan and that he would apply for asylum in the United States. The IJ found that Kanivets "is also time-barred from asylum," but provided no analysis of Kanivets' claim that there were changed circumstances that materially affected his eligibility for asylum pursuant to 8 U.S.C. § 1158(a)(2)(D). Although the time limitation is not reviewable under INA § 208(a)(3), application of the "changed circumstances" exception is a legal issue reviewable on writ of habeas corpus, as preserved by the Supreme Court in *St. Cyr.*

### 2. Irreparable Harm to Petitioner if Stay is Not Issued

■ Petitioner would be irreparably harmed if removed before his habeas peti-

tion was reviewed fully by this Court. Under the circumstances, Kanivets would not be allowed to return to the United States, even to visit his mother, who has been granted asylum, for a period often years. *See* Petitioner's Proposed Conclusions of Law ¶ 69–73 (noting that under 8 U.S.C. § 1182(a)(9), an alien that has overstayed his visa for over one year is barred for ten years and Kanivets is not eligible for a waiver). Pending further review of the record, the court may find legal error that warrants reexamination of Kanivets' application for asylum. If so, and if Kanivets is found to have a well-founded fear of persecution in Kyrgyzstan, the harm to him would be irreparable if he was removed before this court could review his Petition for Habeas.

### 3. Substantial Injury to Government if Stay is Issued

The government would not be substantially injured by issuance of a stay of removal. Kanivets entered this country in January 1998 and his application for asylum has been under consideration at various administrative and judicial levels since mid–1999. Given the periods of delay up to this point in resolving the merits of his asylum claim, the government would not suffer substantial injury from a final, relatively short delay while this court reviews the Petition for Writ of Habeas Corpus.

### 4. Public Interest

The public interest is served by preserving the right to petition for habeas review.

---

ish and of Russian ancestry); *Korablina v. I.N.S.,* 158 F.3d 1038 (9th Cir.1998) (remanding BIA decision to deny asylum to Jewish Ukrainian who witnessed violent attacks by Ukrainian nationalists against other Jews, was restrained and threatened with death, and had family members attacked by persons looking for her after she fled to the United States); *In re O–Z, I–Z–,* Int. Dec. No. 3346,

1998 WL 177674 (BIA Apr. 2, 1998) (granting asylum to Jewish Ukrainian citizen based on harassment by Ukrainian independence group). The court also notes that Petitioner's mother, who alleged religiously-motivated violence and discrimination nearly identical to that of her son, was granted asylum and withholding of removal in 2002.

The importance of preserving the right to seek habeas review of detention in the immigration context was recognized by the Supreme Court in *St. Cyr*, where the Court ruled that recent changes in federal immigration statutes had not repealed the right of aliens to petition for a Writ of Habeas Corpus based on legal or constitutional error. The Court cited as support for its holding the fact that the writ had been used historically to remedy unlawful Executive action. *See St. Cyr*, 533 U.S. at 302–04, 121 S.Ct. 2271. In considering Kanivets' Petition for a Writ of Habeas Corpus, this court requires additional time to study the previous administrative rulings and transcripts to adequately determine whether there were any legal or constitutional errors. The public interest is served by preserving the right to meaningful habeas review by issuing a stay of removal and there is no detriment to the public interest in doing so. Kanivets entered this country legally over five years ago, has held the same job since January 2001, has no criminal record, and poses no danger or inconvenience to the public from his continued presence in this country pending review of his Petition.

An appropriate Order follows.

### *ORDER*

**AND NOW**, this 3rd day of October, 2003, upon consideration of the Petition to Issue a Writ of Habeas Corpus, the proposed findings of fact and conclusions of law from both parties, and after a hearing, it is hereby **ORDERED** that detention and removal are **STAYED** pending this court's ruling on the Petition for a Writ of Habeas Corpus and until further Order of the court.