19-704-ag
*Singh v. Garland*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2020
No. 19-704-ag

**JAGDEEP SINGH,**
*Petitioner*,

v.

**MERRICK GARLAND, UNITED STATES ATTORNEY GENERAL,**
*Respondent.*[*]

---

On Petition for Review of an Order
of the Board of Immigration Appeals

---

SUBMITTED: MAY 17, 2021
DECIDED: AUGUST 25, 2021

---

Before:      LIVINGSTON, *Chief Judge,* and JACOBS and MENASHI,
*Circuit Judges.*

---

[*]  The Clerk of Court is directed to amend the caption as set forth above.

Petitioner Jagdeep Singh, a citizen of India, petitions for review of a February 22, 2019, decision of the Board of Immigration Appeals affirming a November 21, 2017, decision of an immigration judge denying his application for asylum, withholding of removal, and protection under the Convention Against Torture. We conclude that the agency properly determined that Singh could safely relocate within India to avoid the possibility of future persecution or torture and that it would be reasonable to expect him to do so. Singh cannot challenge the agency's determination by relying on general country conditions evidence without showing how the evidence demonstrates that a person in his particular circumstances would be subject to persecution or torture. Singh's allegation that he was mistreated by members of a political party that is aligned with a party in power nationally does not undermine the agency's conclusion that he can safely relocate within the country. Accordingly, we **DENY** the petition for review.

———————

Jaspreet Singh, Jackson Heights, New York, *for Petitioner.*

Genevieve M. Kelly, Office of Immigration Litigation (Joseph H. Hunt, Assistant Attorney General, Civil Division, Cindy S. Ferrier, Assistant Director, Office of Immigration Litigation, *on the brief*), United States Department of Justice, Washington, D.C., *for Respondent.*

———————

2

MENASHI, *Circuit Judge*:

Jagdeep Singh petitions for review of a decision of the Board of Immigration Appeals affirming an immigration judge's denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The agency found that Singh suffered persecution when members of a rival political party assaulted him after he refused to leave his own party. But the agency denied his application for relief because Singh could safely relocate within India. The issue before us is whether the agency erred in finding that Singh could safely relocate within India to avoid future persecution or torture and that it would be reasonable to expect him to do so. We conclude that the agency did not err. Accordingly, we deny the petition for review.

## BACKGROUND

Singh is a citizen of India who arrived in Hildago, Texas, on or about November 5, 2014, without a valid visa or entry document. In December 2014, Singh expressed a fear of returning to India and was placed in removal proceedings. The Notice to Appear charged Singh with being removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an alien who arrived in the United Sates without valid entry documents. Singh was released from the custody of the Department of Homeland Security ("DHS") on bond.

## I

Singh appeared before an immigration judge ("IJ") in Los Fresnos, Texas, on December 14, 2014. He admitted the allegations in

the Notice to Appear, conceding his removability, and filed the application for asylum. The IJ granted a change of venue to New York City based on Singh's place of residence.

On November 21, 2017, the IJ in New York held a hearing on Singh's application for asylum, withholding of removal, and protection under the CAT. At the hearing, Singh testified that he left India because he feared being harmed by members of a rival political party. He said that he joined the Shiromani Akali Dal Amritsar ("Akali Dal Mann") political party in India in 2013 and that he worked for the party in the Hoshiarpur district in the state of Punjab by serving food and setting up tents at events. He explained that the party supports the establishment of an independent state of Khalistan and the release of Sikh prisoners from Indian jails. He further stated that he had no leadership role in the party, that he never engaged in political activity outside of Hoshiarpur, and that members of other parties realized he was a member of Akali Dal Mann when they saw him putting up flyers for an event. He also testified that he did not know any fellow party members who were persecuted within Punjab other than himself.

Singh testified that in July 2014 while he was attending one of his party's rallies, he received a call on his cell phone from an individual claiming to be a member of the rival Shiromani Akali Dal Badal ("Akali Dal Badal") political party. The caller purportedly told Singh that he should work for the Akali Dal Badal "and sell drugs" if he wanted to avoid being killed. Cert. Admin. R. at 100. Singh said that he reported the conversation to the police near the rally but that the police officers responded that they could not respond to the threat because they were "working for the government" and could not "do anything about it." *Id.*

4

Singh also testified that in August 2014 he was approached in person by five individuals claiming to be members of the Akali Dal Badal who similarly told him that "we want you to come and sell drugs for us and work for our party." *Id.* at 102. When Singh refused to do that, the five individuals beat him until he lost consciousness. Singh claimed that while he was unconscious, a passerby recognized him and took him home. After Singh woke up at home, his father took him to the hospital where he received intravenous fluid and "some ointment to put … on my body." *Id.* at 103. He was in the hospital for six or seven hours. Singh said that he never reported the beating to the police. He said that his father advised him not to contact the police because the police officers had not responded to the threatening phone call he had previously reported. Singh said he was "fearful for my life." *Id.* at 104.

Singh said that he did not move to another part of India to avoid the rival party members because, when he rented a home or applied for a job, he would need to provide identification. If he showed his identification to anyone, he said, "[i]t's a very strong possibility that … I would [be] tracked down and I would have been killed." *Id.* at 104. Counsel for the government asked Singh how someone would know from his identification card—which contained his name, address, and birthdate—that he supported the Akali Dal Mann. Singh responded that "[t]his is how it is all over India. That's how they trace people and they kill them." *Id.* at 111. He also suggested that members of an opposing party across India would recognize him because of his work hanging up posters and flyers in Hoshiarpur.

After considering Singh's testimony and the documentary evidence in the record describing political and social conditions in

India, the IJ issued a decision denying Singh asylum, withholding of removal, and protection under the CAT. The IJ found that the "mistreatment" of Singh by "Badal party members" rose "to the level of persecution and that the assailants were motivated by [Singh's] political opinion." *Id.* at 61. Because the IJ found that Singh had been persecuted in the past, the IJ applied a rebuttable presumption that Singh had a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1). The IJ concluded that the government had rebutted that presumption, however, by showing that Singh could safely relocate within India to avoid further mistreatment. *See id.* § 1208.13(b)(1)(i)(B).

Regarding Singh's ability to relocate, the IJ observed that according to a State Department report, Indian law provides for freedom of movement and that the government generally respects that right. The IJ also examined other reports showing that police forces in each Indian state do not routinely communicate about the relocation of citizens. The IJ relied on a report of the Canadian Refugee Board stating that "several sources indicate that Sikhs do not face difficulties relocating to other areas of India." Cert. Admin. R. at 63. The IJ also noted that other reports indicated that "India is a country of some 1.2 billion people and that there are sizable Sikh populations through[out] the country." *Id.*

In response to Singh's claim that he would be discovered in a different region of India on account of his identification card, the IJ observed that a report by the United Kingdom's Home Office explained that India lacks a national police force and a nationwide crime database. The Home Office found no "evidence that there is a central registration system in place which would enable the police to check the whereabouts of inhabitants in their own state, let alone in

any other states or unions within the country." *Id.* The IJ also described the Canadian Refugee Board's finding that "there is little interstate police communication [in India] except for cases of major crimes like smuggling, terrorism, and some high profile organized crime." *Id.* Based on this evidence, the IJ concluded that Singh "would be difficult to locate outside of Punjab even if Punjabi police were seeking him." *Id.* Moreover, the IJ noted that Singh did not even claim to have been targeted by Punjabi police but only by supporters of a rival political party who threatened him over the phone and assaulted him once. The IJ found that even though local police did not respond to the phone threats Singh reported, there was nothing in the record to show that the police were other than merely indifferent, let alone that the police would seek out Singh in another state or assist others in doing so.

Noting that Singh did not allege to be a high-profile member of the Akali Dal Mann, the IJ also relied on a report of the Library of Congress indicating that "only hardcore militants are of interest to Central Indian authorities" and that one does not qualify as a high-profile militant merely by holding pro-Khalistan views. *Id.* at 64. The IJ also observed that "neither the 2016 U.S. Department of State Human Rights Report for India nor the most recent International Religious Freedom Report mentions the persecution of Shiromani Akali Dal Amritsar members in Punjab or elsewhere in India." *Id.*

## II

Singh appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), arguing that he was a prominent figure in the Akali Dal Mann, that the IJ erred by finding that Singh was not a member of the party, and that it was not reasonable for him to relocate within

India given his political activity and education level and India's various social problems, such as unemployment, poverty, corruption, and illness.

In a February 22, 2019, decision, the BIA dismissed the appeal. The BIA accepted the IJ's finding that Singh suffered past persecution, but it also agreed with the IJ that the government had shown that Singh could avoid future persecution by safely relocating within India and that it would be reasonable for him to do so. The BIA observed that the IJ properly shifted the burden to the government to demonstrate Singh's ability to relocate safely and that the government met that burden by a preponderance of the evidence. The BIA concluded that the record supported the IJ's findings that Indian law provides for freedom of movement and that there was no central registration system in India that would enable police to monitor the whereabouts of inhabitants throughout the country. The BIA also said the record supported the IJ's findings that there is no national police force in India, that police stations are unconnected, and that there is little communication between stations except in cases involving major crimes such as smuggling, terrorism, and organized crime. The BIA also found support in the record for the IJ's finding that Sikhs do not face difficulty relocating within India.

The BIA further concluded that the IJ properly found that Singh held no special position in the Akali Dal Mann and that his activities were limited to attending events and posting flyers. The BIA also found no error in the IJ's determination that only high-profile militants are of interest to Indian authorities and that "simply holding pro-Khalistan views would not make someone fit this description." Cert. Admin. R. at 4. The BIA also said the IJ properly found that the 2016 State Department report does not mention persecution of

8

members of the Akali Dal Mann either in Punjab or elsewhere in India and that Singh did not know anyone else who had been persecuted for membership in that party.

In light of the record evidence, the BIA affirmed the IJ's denial of immigration relief. It explained that the IJ's findings "demonstrate that there are areas in India where [Singh] does not have a well-founded fear of persecution and these locations present circumstances that are substantially better than those giving rise to a well-founded fear of persecution on the basis of [his] claim," according to the BIA. *Id*. Moreover, the IJ "permissibly relied on his findings concerning country conditions in determining that it would be reasonable for [Singh] to relocate there" and "properly evaluated the background evidence with respect to both [Singh's] Sikh faith and his membership in a political party." *Id*. at 4-5.

Singh timely petitioned this court for review. He argues that the government failed to show that internal relocation would be reasonable and that he established his eligibility for relief under the CAT.

## DISCUSSION

We have jurisdiction to review the decision of the BIA under 8 U.S.C. § 1252(a)(1), which authorizes judicial review of a final order of removal. When the decision of the BIA is consistent with the decision of the IJ, we may consider both decisions "for the sake of completeness." *Wangchuck v. DHS*, 448 F.3d 524, 528 (2d Cir. 2006).

In this context, Congress has specified that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C.

9

§ 1252(b)(4)(B). Accordingly, we review the agency's decision for "substantial evidence" and "must defer to the factfinder's findings based on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Majidi v. Gonzales*, 430 F.3d 77, 81 (2d Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The scope of review "under the substantial evidence standard is exceedingly narrow, and we will uphold the BIA's decision unless the petitioner demonstrates that the record evidence was so compelling that no reasonable factfinder could fail to find him eligible for relief." *Mu Xiang Lin v. DOJ*, 432 F.3d 156, 159 (2d Cir. 2005) (internal citations, quotation marks, and alterations omitted). By contrast, we review legal conclusions de novo. *Gallina v. Wilkinson*, 988 F.3d 137, 142 (2d Cir. 2021).

A recent decision from our court suggested that § 1252(b)(4)(B)'s "language presents special problems when the finding of fact is an adverse credibility determination" and therefore determined that the standard of review for factual findings provided in § 1252(b)(4)(B) "does not apply literally" to judicial review of agency "adverse credibility findings." *Singh v. Garland*, No. 17-2368, 2021 WL 3176764, at *3 (2d Cir. July 28, 2021).[1] In this case, we are reviewing factual findings other than adverse credibility findings,

_____

[1] That decision admittedly created some tension with our earlier precedents. *See Singh*, 2021 WL 3176764, at *3 (noting that "our Court has frequently cited the 'unless ... compelled' standard in decisions upholding adverse credibility findings"); *see also Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 165 (2d Cir. 2008) ("We review the agency's factual findings, including adverse credibility determinations, under the substantial evidence standard, treating them as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'"); *Majidi*, 430 F.3d at 81.

10

and there is no basis for extending the holding and reasoning of the recent *Singh* case beyond that limited context. Accordingly, we apply the ordinary meaning of § 1252(b)(4)(B) as it has been interpreted in cases such as *Majidi* and *Mu Xiang Lin*.[2] As a unanimous Supreme Court recently emphasized, "The only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Garland v. Ming Dai*, 141 S. Ct. 1669, 1678 (2021). We follow that mandate here.

---

[2] To the extent our court was concerned about the "inconsisten[cy]" a "literal reading" of § 1252(b)(4)(B) would create "with the statutory mandate in 5 U.S.C. § 706(2)(e)," the judicial review provision of the Administrative Procedure Act ("APA"), we do not think that concern can justify a refusal to apply the INA as written in this case. *Singh*, 2021 WL 3176764, at *3. If the express language of the INA conflicts with similar provisions of the APA, the INA controls. *See Ardestani v. INS*, 502 U.S. 129, 133-34 (1991); *Marcello v. Bonds*, 349 U.S. 302, 306-10 (1955). Although the INA originally did not suggest that the APA's judicial review provisions should not apply to review of immigration decisions, *see Shaughnessy v. Pedreiro*, 349 U.S. 48, 50-52 (1955), that does not prevent Congress from amending the INA and thereby limiting the APA's application, *see Henderson v. INS*, 157 F.3d 106, 116-17 (2d Cir. 1998). The standard provided by § 1252(b)(4)(B), which was enacted in 1996, appears to be more restrictive than the INA's previous standard. *Compare* 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."), *with* 8 U.S.C. § 1105a(a)(4) (1994) ("[T]he Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive."). We apply that specific provision of the INA rather than the APA's general judicial review standard to the extent that those standards conflict.

11

# I

Asylum is a discretionary form of relief that the Attorney General may grant to an applicant who qualifies as a refugee. 8 U.S.C. § 1158(b). To qualify as a refugee, an applicant must show that he or she is unable or unwilling to return to his or her country of nationality because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42).

An applicant who has established past persecution is "presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 1208.13(b)(1). That presumption will be overcome, and asylum accordingly will be denied, if (A) "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," or (B) "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality … and under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* § 1208.13(b)(1)(A)-(B). When there has been a finding of past persecution, the government bears the burden of establishing, by a preponderance of the evidence, that an applicant could avoid persecution through internal relocation and that it would be reasonable to expect the applicant to do so. *Id.* § 1208.13(b)(1)(ii).

Withholding of removal, meanwhile, is mandatory "if the Attorney General decides that the alien's life or freedom would be threatened" in the country to which the alien would be removed "because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "[T]o establish eligibility for withholding of removal, an alien must

show … that it is more likely than not that he or she would be subject to persecution" in the country to which the alien would be removed and "must demonstrate that race, religion, nationality, membership in a particular social group, or political opinion was or will be 'at least one central reason' for the claimed persecution." *Matter of C-T-L-*, 25 I. & N. Dec. 341, 343, 348 (BIA 2010). If the applicant is determined to have suffered past persecution in the proposed country of removal, "it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 1208.16(b)(1)(i). As with asylum, that presumption will be overcome if there is either a fundamental change in circumstances or "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* § 1208.16(b)(1)(i)(A)-(B). Again, the government bears the burden by a preponderance of the evidence. *Id*. § 1208.16(b)(1)(ii).

Both asylum and withholding of removal depend on a showing of persecution. "To qualify as 'persecution' the conduct at issue must be attributable to the government, whether directly because engaged in by government officials, or indirectly because engaged in by private persons whom the government is 'unable or unwilling to control.'" *Scarlett v. Barr*, 957 F.3d 316, 328 (2d Cir. 2020) (quoting *Pan v. Holder*, 777 F.3d 540, 543 (2d Cir. 2015)); *see also Rizal v. Gonzales*, 442 F.3d 84, 92 (2d Cir. 2006) (noting that persecution may "be found when the government, although not itself conducting the persecution, is unable or unwilling to control it"). Under the unwilling-or-unable standard, "a finding of persecution ordinarily requires a determination that government authorities, if they did not actually

13

perpetrate or incite the persecution, condoned it or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *see also De Castro-Gutierrez v. Holder*, 713 F.3d 375, 381 (8th Cir. 2013) ("[A]n alien seeking to establish persecution based on the violent conduct of private actors … must show that the government condoned it or at least demonstrated a complete helplessness to protect the victims.") (internal quotation marks omitted); *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006) (holding that private party violence "cannot be labeled 'persecution' absent some proof that the … government condoned it or at least demonstrated a complete helplessness to protect the victims") (internal quotation marks omitted).

Singh also seeks protection under regulations implementing the CAT. Under those provisions, removal will be withheld or deferred if the applicant establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *accord id.* § 1208.17(a). The torture need not be on the basis of a protected ground, but the showing must be of "torture[] by, or with the acquiescence of, government officials acting in an official capacity." *Mu Xiang Lin*, 432 F.3d at 159. This court "has stated that acquiescence is demonstrated by evidence that 'government officials know of or remain willfully blind to an act of torture and thereafter breach their legal responsibility to prevent it.'" *Scarlett*, 957 F.3d at 334 (quoting *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004)) (alteration omitted); *see also* 8 C.F.R. § 1208.18(a)(1), (7).

14

**II**

In this case, we decide whether the agency erred in finding that Singh could safely and reasonably relocate within India and how that determination affects Singh's claims for asylum, withholding, and CAT relief.

We conclude that the agency's finding that Singh could internally relocate was supported by substantial evidence. Singh argues that the agency erred because internal relocation would not help him avoid future persecution. He claims that he "was persecuted by the government" because he was harmed by members of "the Akali Dal Badal party which is in coalition with the [Bharatiya Janata Party ("BJP")] that is the ruling party in India." Petitioner's Br. 15-16. Singh contends that "[w]hen the persecutor is the government, 'it has never been thought that there are safe places within a nation.'" *Id.* at 16 (quoting *Singh v. Moschorak*, 53 F.3d 1031, 1034 (9th Cir. 1995)) (alteration omitted).

Contrary to his contention, however, Singh was not persecuted by the government. An applicant's allegation that he was persecuted by members of a political party—even one that is in power nationally or, as Singh alleges of the Akali Dal Badal, is aligned with a party in power nationally [3]—does not establish that the applicant was persecuted by the government. Members of a political party are not the government; for mistreatment inflicted by party members to amount to persecution, an applicant must show that the government

---

[3] The alliances of the relevant political parties have changed since Singh filed his briefs in this case. *See 'Akali Story with BJP Over'—Sukhbir Badal Calls for Tie-Up of Regional Parties for 2024 Polls*, ThePrint.in (July 25, 2021). We do not believe this case turns on those shifting coalitions.

was unwilling or unable to control the attackers. *Pan*, 777 F.3d at 543; *Galina*, 213 F.3d at 958.

In this case, the agency determined that Singh had been subjected to past persecution based on his mistreatment by Akali Dal Badal members without finding that the government had condoned the mistreatment or was unable to control the attackers. Cert. Admin. R. at 61. We doubt that the finding of past persecution was correct, but we need not disturb that unchallenged finding in order to reject Singh's argument that "there are [no] safe places" for him "within" India because he "was persecuted by the government." Petitioner's Br. 15-16. Neither the IJ nor the BIA was required to attribute an attack by members of a regional party in Punjab to the national government of India. Instead, the IJ properly concluded that Singh had not been targeted even by local authorities. *See* Cert. Admin. R. at 63 ("[R]espondent has not claimed that he was ever targeted by Punjabi police. Instead, he claims that it was supporters of a rival political party who made threats over the phone and then beat him on one occasion."). While Singh testified that the police failed to assist him in connection with his report of a telephone threat, "it does not follow that police in Punjab would seek to find him if he returned to the country and lived in another state or that they would assist others in doing so." *Id*. at 64.[4]

---

[4] We therefore disagree with the Ninth Circuit's conclusions in *Singh v. Whitaker*, 914 F.3d 654 (9th Cir. 2019), that harm inflicted by political party members is tantamount to persecution "at the hands of the government" and that persecution by "local authorities" creates a "rebuttable presumption … that the threat exists nationwide." *Id.* at 661. Individuals who are merely members of a ruling political party are not part of the government, and the extent to which persecution by actual governmental

Next, Singh argues that the record demonstrates that he will face persecution even if he relocates within India. He points to country-conditions evidence showing various harms that have purportedly occurred in India: "corruption," "reports of political prisoners in certain states," "instances of censorship and harassment of media outlets," "[l]egal restrictions on religious conversion," and "discrimination based on religious affiliation, caste or tribe." Petitioner's Br. 11. He notes other country-conditions evidence suggesting that "[m]any police officers refuse to register crime complaints," "use illegal detention, torture, and ill treatment to punish criminals against whom they lack of time or inclination to build cases," and "arrest and detain individuals on false charges at the behest of powerful local figures or due to other forms of corruption." *Id.* at 15-16.

This evidence, however, does not compel the conclusion that internal relocation would not avert future persecution. First, an applicant challenging a finding that internal relocation would avert future persecution—like all applicants challenging an adverse agency determination regarding future persecution or torture—cannot simply point to general country-conditions evidence without showing how that evidence compels the conclusion that a person in the applicant's "particular circumstances" would be unable to relocate to avoid persecution. *Zhong v. DOJ*, 480 F.3d 104, 126 n.26 (2d Cir. 2007); *see also Mu Xiang Lin*, 432 F.3d at 160 (noting the importance of "particularized evidence"). General country-conditions evidence

authorities affects the feasibility of internal relocation depends on the circumstances of the particular case. Here, the agency reasonably concluded that—even assuming that Singh faced a threat of persecution in his locality—that threat does not exist nationwide.

17

does not on its own compel the conclusion that an individual will be persecuted or that internal relocation is insufficient to avert persecution. Singh fails to show how the country-conditions evidence establishes that he—that is, a person in his particular circumstances—would be persecuted even after relocating internally. Instead, his argument suggests that living conditions generally throughout India are intolerable and amount to persecution. Asylum and other forms of immigration relief are individual remedies designed to avoid persecution inflicted on particular persons. General country-conditions evidence is insufficient to overcome an agency finding that a particular applicant would avoid future persecution through internal relocation.

Finally, Singh's evidence does not compel the conclusion that it would be unreasonable to expect him to relocate internally to avoid future persecution. Under the regulations in place at the time of Singh's proceedings, the agency determined the reasonableness of internal relocation by considering "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 1208.13(b)(3) (2017). The regulation provided that "[t]hose factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate." *Id.*[5]

---

[5] This regulation was in force from July 18, 2013, to November 8, 2018, and has since been amended. *See Procedures for Asylum and Withholding of*

The agency's decision that it would be reasonable to expect Singh to relocate was supported by substantial evidence. The record contained evidence that there are 1.2 billion people, including 19 million Sikhs, living in India and that Indian citizens—Sikhs in particular—do not face difficulties relocating within the country.[6] The record also reflected that there is no central countrywide registration system or nationwide police database that members of the Akali Dal Badal could use to track rivals and that only high-profile militants—not local party organizers such as Singh—are of interest to national authorities. As the IJ noted, there have been no recent reports of persecution against members of the Akali Dal Mann anywhere in India and Singh did not identify any, let alone enough to be arguably nationwide. Moreover, evidence of police abuse of prisoners was not material to the analysis because Singh did not claim to be a target of police or establish that he was likely to become a prisoner.

Singh additionally argues that it would not be reasonable for him to relocate because he was a farmer in Punjab and Sikhs cannot own land in the state of Gujarat, language barriers exist in some states, and unskilled Sikhs face difficulties finding employment. Singh does

*Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274, 80,387 (Dec. 11, 2020).

[6] Singh objects to the agency's consideration of evidence related to the ability of Sikhs to relocate because, he contends, "[t]he IJ and the BIA overlooked that Petitioner suffered persecution because of his 'political opinion' not because of his 'religion' i.e. Sikh." Petitioner's Br. 14. In the context of internal relocation, whether Sikhs are able safely to move throughout India was a relevant consideration. *See* 8 C.F.R. § 1208.13(b)(3) (noting that the agency may consider, *inter alia*, "whether the applicant would face other serious harm in the place of suggested relocation"). It was not erroneous for the agency to consider that evidence.

not provide evidence suggesting that such issues are widespread, and indeed not limited to a few Indian states. Moreover, these arguments are not compelling given that Singh was able to move to the United States and currently works in construction in New York City.

In the end, what we recognized fifteen years ago remains true today: An Indian citizen such as Singh "is unlikely to face persecution for his Sikh beliefs and his membership in Akali Dal Mann" and "any threat faced by [such an applicant] in India is not country-wide." *Singh v. BIA*, 435 F.3d 216, 219 (2d Cir. 2006). We hold again, on a current record, that these conclusions of the agency are supported by substantial evidence. The agency therefore did not err in deciding that, in this case, the government rebutted the presumption that Singh has a well-founded fear of persecution by showing that he could safely and reasonably relocate to avoid future persecution. *See* 8 C.F.R. § 1208.13(b)(1)(i)-(ii).

This determination is dispositive of Singh's application for asylum and eligibility for withholding of removal. *Id.* §§ 1208.13(b)(1)(i)(B), 1208.16(b)(1)(i)(B). The determination also disposes of Singh's claim for relief under the CAT because Singh's ability to relocate internally means that he cannot establish a likelihood of torture. "In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal," the agency considers "all evidence relevant to the possibility of future torture … including … [e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3). The agency properly relied on such evidence here.

## CONCLUSION

"Asylum in the United States is not available to obviate relocation to sanctuary in one's own country." *Singh*, 435 F.3d at 219. Here, the agency did not err in finding that Singh could safely and reasonably relocate within India to avoid future persecution or torture and that it would be reasonable to expect him to do so. We therefore **DENY** the petition for review. All pending motions and applications are **DENIED** and stays **VACATED**.